# EXHIBIT A
# part 2 of 2

39

1   the construction field, which Mr. Totten has worked

2   from when he left school at an early age to get into

3   the construction trade, specifically, as a tile setter

4   and -- and, otherwise, working in construction.  He

5   has the support of his brother, who would provide him

6   that employment, and would be there as a mentor as

7   well as someone in the community who can guide -- help

8   to guide Mr. Totten.  In addition, Mr. Totten's

9   parents are there providing a home for him, and also

10  additional guidance and support, and other family

11  members and other community support.  So, clearly, Mr.

12  Totten would have every reason to adhere to the laws.

13  Clearly, he's someone who has not had any history of

14  any violation of law prior to the commitment offense,

15  nor since the commitment offense, and --

16      SIDE 2

17      **DEPUTY COMMISSIONER BENTLEY:**  OK.  This is the

18  second side of the tape in the subsequent parole

19  consideration hearing for Inmate Totten, Anthony, CDC

20  number H-21049.

21      **ATTORNEY HALL:**  Clearly, Mr. Totten has shown

22  remorse and expressed, again, today his deep and

23  sincere remorse for having committed this crime, that

24  he is looking forward to being out in the community

25  where he can continue to abide by the rules of

26  society.  Again, having grown up in a stable family

27  life, having left school early to work in the tile

40

1    trade with his father, and working in the union, he,

2    certainly, can return to work in this field and,

3    again, join the union and continue to work

4    productively.  We believe that given all the

5    accomplishments of Mr. Totten in, clearly,

6    demonstrating that he has matured over the years, and

7    at his present age of 48 years old where most

8    psychologists opined that at this age, the risk of

9    recidivism, certainly, has decreased substantially, we

10   believe that Mr. Totten continues to demonstrate that

11   he can continue to obey the rules, and for those

12   reasons, we would ask that parole be granted at this

13   time.

14       PRESIDING COMMISSIONER BRYSON:  All right.

15   Thank you, counselor.  All right.  Sir, I'd like to

16   give you the opportunity to make a statement to this

17   panel regarding your suitability for parole.

18       INMATE TOTTEN:  Well, I think I've demonstrated

19   over the past 15 years that I can follow the law, and

20   I, like I said, I was out on bail during the -- before

21   and after my conviction, and I did turn myself in so

22   that showed responsibility and remorse by turning

23   myself in, and I've -- I'm -- I'm really sorry that

24   this happened, and I apologize to the district

25   attorney in Orange County, and my family, and Janet

26   and the kids for what I've put 'em through.

27       PRESIDING COMMISSIONER BRYSON:  OK.  Thank you

41

1   for your remarks.   We'll now recess for deliberation.

2   The time is 12:10.

3                        R E C E S S

4                          --o0o--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

42

1        CALIFORNIA BOARD OF PAROLE HEARINGS

2                  D E C I S I O N

3        DEPUTY COMMISSIONER BENTLEY:  All right.  We've

4   reconvened for the decision in the matter of Anthony

5   Totten, and the time is 12:50.  Everyone who was has -

6   - was prior in the room has returned.  Sir, the panel

7   reviewed all the information received from the Public

8   and from you, and relied on the following

9   circumstances in concluding that you are not suitable

10  for parole and would pose an unreasonable risk of

11  danger to society or a threat to public safety if

12  released from prison.  The offense was carried out in

13  an especially cruel and callous manner in that after

14  seven years of marriage, and your wife had left you,

15  and was suing for divorce.  She was particularly

16  vulnerable in that, as you knew, she was en route to a

17  doctor's appointment for her five-months pregnancy.

18  You wanted her to have an abortion.  She was under

19  great stress from prior incidents with you and she was

20  unarmed.  Your wife had suffered repeated harassment

21  and death threats from you.  Multiple police reports

22  exist testifying to that, and she obtained a

23  restraining order on October 26th of 1990.  The

24  offense was carried out in a dispassionate and

25  calculated manner intended to be an execution style

26  murder.  You took a loaded, bold action rifle

27  **ANTHONY TOTTEN    H-21049   DECISION PAGE 1    8/3/06**

43

1    disguised as a gift to intercept her at Kaiser

2    Permanente Hospital getting her into the vehicle under

3    the pretext of holding a doll swing for her daughter's

4    birthday.  You took out the rifle to murder her, but

5    she saw the gun and struggled to disarm you.  The

6    weapon discharged inside the van hitting you in the

7    leg and the victim fled the vehicle.  You have no

8    prior record.  You have today been very forthcoming as

9    to your poly substance abuse including marijuana and

10   methamphetamine at the time of the commitment offense.

11   As to your institutional behavior, you have performed

12   commendably in programming.  You are currently working

13   as a machine operator and you -- as by your own

14   testimony, you work overtime 40 to 50 hours a week.

15   Your work reports have all been above average to

16   exceptional.  You did receive a G.E.D.  in '93, and

17   you also achieved the certification in landscaping so

18   you clearly, have marketable skills.  You have been

19   consistent since 1997 with AA and NA, which is very

20   important, and you're to be commended for doing that.

21   You've also taken several other courses including AIDS

22   prevention and hepatitis prevention, and you have

23   numerous laudatory chronos for your conduct and for

24   your work here.  As to the misconduct in prison, you

25   have zero 115s, and that's very rare.  We really

26   rarely see that.  You have two 128As, the last in '95

27   **ANTHONY TOTTEN    H-21049    DECISION PAGE 2    8/3/06**

44

1   for unauthorized use of the phones.  So you've now --

2   you've been displaying continuous positive behavior in

3   prison.  As to the psychological report dated November

4   19th, 2003, by Doctor Talbot, the report does not --

5   is not totally supportive of release.  As to your

6   parole plans, you did present today viable residence

7   plans in California, that is with your parents, and

8   acceptable employment plans with your brother's

9   construction company, and, clearly, your background in

10  tile work and landscaping more than qualifies you to -

11  - to have marketable skills in those areas.  As to

12  Penal Code 3042 responses, responses indicate

13  opposition to finding of parole suitability

14  specifically by the district attorney Of Orange

15  County.  In a separate decision, the hearing panel

16  finds it's not reasonable to expect that parole would

17  be granted at a hearing during the following two

18  years.  Specific reasons for this finding are as

19  follows:  The offense was carried out in an especially

20  cruel and callous manner in that after seven years of

21  marriage, while you were having an affair, your wife

22  had left you and was suing for divorce.  You were

23  particularly vulnerable -- the victim was particularly

24  vulnerable in that, as you knew, she was en route to a

25  doctor's appointment for her five-months pregnancy.

26  You wanted her to have an abortion.  She was under

27  **ANTHONY TOTTEN    H-21049    DECISION PAGE 3    8/3/06**

1   great stress from prior incidents with you and she was

2   unarmed.  She had suffered repeated harassment and

3   death threats from you, multiple police reports attest

4   to that, and she obtained a restraining order on

5   October 26th, 1990.  The offense was carried out in a

6   dispassionate and calculated manner intended to be an

7   execution style murder.  You took a loaded bold action

8   rifle disguised as a gift to intercept her at Kaiser

9   Permanente Hospital getting her into the vehicle under

10   the pretext of holding a doll swing for their -- for

11   your daughter's birthday.  You took out the rifle to

12   murder to her, but she saw the gun and struggled to

13   disarm you.  The weapon discharged inside the vehicle

14   hitting you on the leg and she fled the vehicle.  You

15   grabbed her arm and hit her head.  Breaking free, she

16   ran around you, heard the gun cock and a shell eject,

17   and then she fell to the ground and was hit in the

18   head.  You then kicked her body with your foot and

19   fled.  The offense was carried out in a manner

20   demonstrating exceptionally callous disregard for

21   human suffering.  You had no regard for your wife or

22   children's welfare or safety, nor for public safety,

23   and you had clear opportunities to cease, but you

24   continued.  Sir, the motive for this crime is

25   inexplicable.  As a result of the injuries, the victim

26   lost hearing in one ear, suffered a broken jaw that

27   ANTHONY TOTTEN   H-21049  DECISION PAGE 4   8/3/06

46

1    had to remain wired for one and a half months and, to

2    this day, has permanent damage.  Sir, this was a grave

3    offense.  It's amazing your wife didn't die.  The

4    panel believes you're still in denial about the

5    causative factors in the relationship with you and

6    your wife, and perhaps other relationships that led to

7    the commitment offense, therefore, you remain

8    unpredictable and a threat to public safety.  In

9    denying you parole for two years, we're placing you on

10    the 2008 calendar for your next subsequent hearing.

11    The board recommends that you get self help, and we're

12    specifically recommending anger management because,

13    primarily, we're hoping that will give you some

14    insight into your -- your background and what led up

15    to this -- this crime, and that you stay discipline

16    free and earn positive chronos, and we're also

17    ordering a knew psychological evaluation per BPT

18    1000A.  Commissioner, do you have anything to add at

19    this time?

20         PRESIDING COMMISSIONER BRYSON:  No.

21         DEPUTY COMMISSIONER BENTLEY:  All right. I wish

22    you good luck, sir.

23         INMATE TOTTEN:  All right.  Thank you.

24         DEPUTY COMMISSIONER BENTLEY:  Uh huh.

25

26

27    ANTHONY TOTTEN    H-21049    DECISION PAGE 5    8/3/06

47

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED TWO YEARS

24    THIS DECISION WILL BE FINAL ON: _DEC 0 1 2006_

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    ANTHONY TOTTEN    H-21049   DECISION PAGE 6    8/3/06

48

## CERTIFICATE AND DECLARATION

## OF TRANSCRIBER

I, TAMA BRISBANE, the owner of House of
Scribes, have designated KENDRA ROSE, a duly
designated transcriber with House of Scribes residing
in the State of California, to prepare the foregoing
transcript.  With my signature I do hereby declare and
certify, under penalty of perjury, that I have
directed her to transcribe tape(s) that total 1 in
number and cover a total of 50 pages.  The recording
was duly recorded at CALIFORNIA DEPARTMENT OF
CORRECTIONS, CORRECTIONAL TRAINING FACILITY, and the
foregoing pages constitute a true, complete and
accurate transcription of the aforementioned tape to
the best of her ability.

I hereby certify that House of Scribes and
its designated transcribers are disinterested parties
in the above-captioned matter and have no interest in
the outcome of the proceeding.

Dated November 12, 2006 in Stockton,
California.


Tama Brisbane
Owner, House of Scribes

# EXHIBIT    "2"

*Institution copy*

ORANGE COUNTY
PROBATION DEPARTMENT

CENTRAL SUPERIOR  COURT, Dept. Div. ___35___ Time _____

Defendant's Full Name:  TOTTEN, Anthony Lee                    P & S Date: 1/3/92
AKA:
Address:  23422 Caminito Telmo                                 C _ 82571      A _ 200544
          Laguna Hills, CA 92683
Present Whereabouts:  Bail                                     DPO: Bruce R. Carel/ds/jf

Telephone:  859-9515                                          Attorney:  Leonard McBride

## COURT STATUS

Present Offense __664/187 PC, plus__                                    Arresting Agency __HBPD__
__1203.06(a)(1), 12022.5(a) & 12022.7 PC.__  Date of Offense __10/30/90__   Date of Arrest __10/31/90__
Inf./Xxxx Filed __12/6/90__  Guilty by __Jury trial__                   Date __12/3/91__
Days in Custody __41__       Codefendants __None__

## DESCRIPTION
(Ver BC)
Age _33_ DOB _7/3/58_ POB _Santa Monica, CA_   Ethnic Background _Cauc_ Sex _Male_
Height _5-11_ Weight _190_ Hair _Brown_ Eyes _Blue_  Complexion _Fair_
Identifying Marks __No__                              Social Security No. __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__
Date of Arrival in California _____Birth_____  Date of Arrival in Orange County __1958__
FBI __558215MA2__ CII __A09599685__ OCSO __753 780__  Operator's License __N5065193__
                                                     Expiration Date __1994__

| PRIOR PROBATION GRANTS | | | PRIOR PAROLE GRANTS | | |
|---|---|---|---|---|---|
| Year None | County | Term | Year None | State | Term |

## EMPLOYMENT HISTORY
(Ver paystubs)
xxxx or Present Employer __Superior Tile__   Address _____ City __Pomona__
Date Began __12/4/91__ Date Terminated __Present__ Reason __N/A__
Type of Work __Tile setter__  Work Phone __Unk__                Salary __$20 Hr.__
Previous Employment:

| Dates From | To | Employer | Type | Salary | Reason Terminated |
|---|---|---|---|---|---|
| 1979 | 1984 | Bayshore Tile | Helper | $2,800 Mo | Lack of work |
| 1984 | 1990 | Continental Tile | Tile Setter | $3,600 Mo | " " |
| 5/90 | 10/90 | Mike Leweki | " " | $20 Hr. | " " |

## MARITAL HISTORY

Present Spouse          Home Address          DOB    Date & Place of Marriage    Status
__Denies__
Occupation                                   Employment Address

| Children | Address | DOB | Sex | Other Parent |
|---|---|---|---|---|
| Melissa Totten | Unknown | 10/31/85 | F | Janet Totten |
| Eric Totten | " | 9/3/89 | M | " " |
| Lucas Totten | " | 2/12/91 | M | " " |

| Previous Marriages | Address | Date Married | Terminated |
|---|---|---|---|
| Janet Totten. | Unknown | 2/9/85 | 10/90 |
| | | | "Status unsure |

CONFIDENTIAL
Per Sec. 11142 P.C. The Furnishing of this Report, or Information Contained within to an Unauthorized Person is misdemeanor.

PRE SENTENCE REPORT

F0602-1020.8 (A) (8/79)



## FAMILY DATA

doptive Father __Jason Totten__ Died _____ Age _53_ DOB _3/2/37._ POB _Boise, ID_
Address _23422 Caminito Telmo_ Telephone _859-9515_ Ethnic Background _Cauc_
Occupation _Tile Setter_     Laguna Hills     Religion _Baptist_
Marriage Date _4/23/59_ Status _Intact_

Mother _Gana Totten_ Died _____ Age _50_ DOB _4/16/40_ POB _Denver, CO_
Address _As above_ Telephone _____ Ethnic Background _Cauc_
Occupation _Senior Citizen Supervisor_ Religion _Baptist_

Other Marriages: Father

| Name | Dates | Status of Marriage | Date of Termination |
|------|-------|--------------------|---------------------|
|      |       |                    |                     |
|      |       |                    |                     |
|      |       |                    |                     |

Other Marriages: Mother

| Name | Dates | Status of Marriage | Date of Termination |
|------|-------|--------------------|---------------------|
| Gary Zinn (Natural father) | Unk | Divorced | 1959 |

| Brothers & Sisters | Age | Address No. | Street | City | State | Occupation |
|--------------------|-----|------|--------|------|-------|------------|
| Kip Kibler | 34 | 103½ | Hoskins, | Huntington Beach | | Florist |
| Perry Totten | 31 | | Cortland, | Rancho Cucamonga | | Asphalt |
| Jamie Totten | 29 | 1580 | Santiago, | Corona | | R.D.A. |
| | | | | | | |
| | | | | | | |

| Former Residences | Dates From | To |
|-------------------|------------|-----|
| Los Angeles, Riverside or Orange Counties | Birth | Present |

## EDUCATIONAL BACKGROUND

Highest grade completed _11th_ Where _University H.S., Irvine_ Degrees held _None_

## MILITARY RECORD

Branch _N/A_ Dates of Service _____ Service No. _____
Highest rate or rank _____ Type of Discharge _____ Job Classification _____
Duty Assignments _____ Honors & Benefits _____

## PERSONAL INFORMATION

Health _Good_    Health Problems _None_    Organizations—Religion _LOcal #11, Tile & Marble Finishers    Baptist_

Hobbies and Interests

_Fishing, music, sports._

Habits
Tobacco: _½ pack cigarettes daily_
Liquor: _4-5 times yearly_
Drugs: _Denies present use; previously used methamphetamine (nasally)._

Vehicle License No. _Denies_    Firearms owned / possessed: _Denies_
Type _____
Color _____
Year _____

Additional Data:

COURT STATUS

On December 6, 1990, an Information was filed in the Superior

Court of Orange County, charging the defendant, Anthony Lee Totten,

with one count of violation of Section 664/187 of the Penal Code

(Attempted Murder). It was further alleged the defendant had

personally used a firearm in the commission of the offense, within the

meaning of Penal Code Sections 1203.06(a)(1) and 12022.5(a).

Additionally, it was alleged that in the commission of the offense, the

defendant had intentionally inflicted great bodily injury, within the

meaning of Penal Code Section 12022.7.

On December 3, 1991, following jury trial, the defendant was

found guilty as charged and true findings were made as to the

additional allegations. The matter was continued to January 3, 1992,

in Department 35 of Orange County Superior Court, for a probation and

sentencing hearing and the Probation Department was ordered to prepare

a court report for that hearing.

CIRCUMSTANCES OF THE OFFENSE

As the Court has heard testimony concerning this case, the

following will be a relatively brief review of the facts of the

offense.

According to records of the Huntington Beach Police

Department (case #90-28711), on October 30, 1990, at approximately

10:32 a.m., a report was received indicating a woman had been shot in

the head in front of the Kaiser Permanente Medical Facility at 18081

Beach Boulevard. Numerous officers converged on the scene and learned

the victim was 29-year-old Janet C. Totten. She was found to be

bleeding heavily from a head wound but was conscious and identified her

1  assailant as her husband, the defendant, Anthony Lee Totten.  She was

2  rushed by helicopter to Hoag Memorial Hospital in Newport Beach, where

3  she was later interviewed by detectives.  Several witnesses at the

4  scene of the offense described having seen Mrs. Totten running in front

5  of the medical center, pursued on foot by the defendant, who was armed

6  with a rifle.  They indicated he fired one shot from the rifle,

7  striking the victim in the head and knocking her to the ground.  He

8  then fled on foot from the location.  Numerous officers unsuccessfully

9  searched for him in the surrounding area.

10        Mrs. Totten was interviewed in Hoag Hospital and said she had

11  just left Kaiser Permanente after a doctor's appointment (she was

12  pregnant at the time), when she observed her estranged husband standing

13  in front of the facility holding a white box.  She pointed out she had

14  recently obtained a temporary restraining order against him because of

15  problems they had had concerning child visitation arrangements.  She

16  said she began walking toward her vehicle, which was parked in a nearby

17  lot, and her husband approached her and said the box he was holding was

18  a present for their five-year-old daughter.  She indicated he began

19  talking to her about their relationship and asked her to give him a

20  ride to his vehicle, which was parked behind the medical center.  He

21  placed the box on the back seat of her car and while the two of them

22  were seated in the vehicle, he continued talking about their

23  relationship.  He reportedly became extremely upset and retrieved the

24  white box.  She stated she saw him removing a rifle from the box and

25  became fearful he intended to kill her.  She indicated they struggled

26  over the weapon (it was later learned the rifle was discharged twice in

27  the car and one of the bullets entered and exited the defendant's leg)

28

4

TOTTEN, Anthony Le                                                Page 5

1  while she honked the horn of the car, screaming for help.  She stated

2  she was able to open her car door and ran toward the medical center.

3  She indicated she saw her husband pursuing her with the weapon and

4  heard him yell that he was going to kill her.  She said he eventually

5  caught up to her and shot her in the back of the head.  Mrs. Totten

6  said she had been threatened with death the preceding week by her

7  husband because of problems they were having, but did not really think

8  he would make good in his threats.

9       It was later learned the defendant had purchased the rifle i

10  question on October 27, 1990.  The rifle was later located in a trash

11  dumpster near the scene of the offense.  The defendant's truck was

12  found parked in the lot of the medical center.  An athletic sock,

13  located in the defendant's vehicle, was found to contain seven .22-cal

14  long rifle rounds.  An unexpended .22-cal. long rifle round was found

15  on the ground near the location of the victim.

16       On October 31, 1991, the defendant, accompanied by his

17  attorney, John G. Hendry, turned himself in at the Garden Grove Police

18  Department.  He was transported to Garden Grove Hospital for treatment

19  of a flesh wound to his right leg.  A detective from the Huntington

20  Beach Police Department was summoned to the hospital and learned Mr.

21  Totten would not make a statement at that time, on advice of his

22  attorney.  He was taken into custody and was transported to the

23  Huntington Beach Police Department for routine booking.

24  VICTIM'S STATEMENT

25       The victim of this case, Janet C. Totten, was personally

26  interviewed at the Probation Department on December 20, 1991.  During

27  that interview, she was advised of the date and location of today's

28



1   sentencing hearing and of her right to be present before the

2   defendant's sentencing if she desired.

3          Mrs. Totten said that she had been acquainted with the

4   defendant for approximately two years before their marriage on

5   February 9, 1985.  She said that they separated in either February or

6   March of 1990, and she acknowledged being aware he was romantically

7   involved with another woman.  She stated that she felt it was important

8   for the Court to understand that there were a number of episodes

9   previously reported to the police which involved violence or threats on

10  her husband's behalf prior to the commission of the present offense.

11  She provided the probation officer with a copy of an Orange County

12  Department of Social Services court report dated November 28, 1990

13  (concerning the status of the three children the defendant has had by

14  his relationship with Mrs. Totten), and she indicated that five prior

15  police incidents were accurately portrayed in that report.  It is noted

16  all five of the incidents were reported to the Westminster Police

17  Department.  The first incident (case #90-0812) was reported on

18  February 19, 1990.  On that occasion, Mrs. Totten called the

19  Westminster Police Department because the defendant, from whom she was

20  separated at the time, was harassing her about picking up some tax

21  documents at her home.  The responding police officer arranged for

22  Mrs. Totten to give the documents to the defendant and reportedly

23  advised him that in any future attempt to contact his wife, he should

24  contact the Westminster Police Department first "in order to keep the

25  peace".  The second report (case #90-5284) indicates that on May 12,

26  1990, Mrs. Totten called to report that on that date her estranged

27  husband had come to her house to visit their children and began arguing

28

TOTTEN, Anthony Lee                                         Page 7

1   with her and yelling profanities at her.  She acknowledged that she

2   threw a glass of Coca Cola into his face after becoming angry and he

3   threatened to call the police; she consequently went to get a

4   telephone.  She was told by the defendant not to touch the telephone

5   and after she reportedly pushed him (the victim told the probation

6   officer she did not actually push her husband but, rather, tried to

7   walk past him), he punched her in the mouth, knocking her to the

8   ground, breaking one of her front teeth.  The third report (case #90-

9   2314) was filed on July 12, 1990.  On that occasion, Mrs. Totten had

10  returned to the dwelling where she resided and noticed that all the

11  windows were open and the lights were out.  As she felt those

12  circumstances were suspicious, she reported the matter to the

13  Westminster Police Department, but no further assistance was required.

14  On the fourth occasion, a report (case #IR1755) was filed on October

15  23, 1990.  Mrs. Totten reported that her estranged husband had just

16  left the dwelling after vandalizing their car.  Officers discovered the

17  right front tire of the vehicle had been cut and that a windshield

18  wiper control lever was broken off at the steering column.  Mrs. Totten

19  reportedly told investigating officers that the defendant had just

20  spent five days at the University of California at Irvine Medical

21  Center "for counseling regarding his unstable mental condition."

22  Officers referred her to Superior Court to obtain a restraining order.

23  The last report (case #90-0739) was made on October 24, 1990.

24  Mrs. Totten reportedly indicated that the defendant had telephoned her

25  and threatened to kill her and had driven by her dwelling two times,

26  stopping each time for several seconds.  The victim of this case

27  subsequently obtained a restraining order on October 26, 1990, which

28

TOTTEN, Anthony Le·                                                    Page 8

1    specified that the defendant was to stay 100 yards away from Mrs.

2    Totten, their two children and Mrs. Totten's mother.  The order further

3    indicated that child visitation was to be monitored by the defendant's

4    parents or grandmother.

5              During her interview at the Probation Department, Mrs. Totten

6    stated that, in addition to the five official reports listed above,

7    there had been numerous occasions when the defendant had threatened her

8    and her mother with injury or death.

9              As to the present offense, Mrs. Totten offered the following

10   information.  On the day she was shot, she had an appointment with a

11   doctor at Kaiser Permanente Hospital in Huntington Beach concerning her

12   pregnancy.  As she was leaving the doctor's appointment, she was

13   approaching her car when she initially saw the defendant as he ran up

14   to her, holding a long white box.  She acknowledged being frightened

15   and said that the defendant told her the contents of the box consisted

16   of a present for their oldest daughter.  She said that he asked her if

17   she intended to report him as being in violation of the temporary

18   restraining order and then asked if he could put the "gift" in the back

19   seat of her car.  She allowed him to do so and he then asked her to

20   give him a ride to the back of the medical facility where he was

21   reportedly working.  She pointed out that he was wearing his typical

22   work clothes and had a measuring tape on his belt, so she assumed what

23   he said was true.  She also indicated that while there were many

24   occasions when he was very much out of personal control, he seemed to

25   be calm on this particular occasion, therefore, she agreed to give him

26   a ride.  Mrs. Totten said that as she was backing up in her vehicle,

27   she turned to ask him where he wanted to be driven and saw that he had

28   pulled out a gun.  She said that he stated "I have a gun" and told her



TOTTEN, Anthony Le.                                                              Page 9

1   to begin to drive. She said she replied "No, you can't do this, Tony"

2   and tried to push the gun away from herself. She acknowledged that

3   they began struggling and then "It got crazy." Mrs. Totten said that

4   she did not see her husband operate the bolt on the rifle, nor did she

5   hear any gunshots. She also denied smelling the odor of gun powder and

6   said that she assumes that she did not make any of those perceptions as

7   she was preoccupied trying to get out of her vehicle. She said she

8   was ultimately able to open her driver's side door during the struggle

9   but that the defendant continued to reach over and pull her by the

10  right arm back into the car. She indicated that she was finally able

11  to exit the vehicle and began running. She looked over her shoulder

12  and saw that he had exited the passenger side and had the rifle in his

13  hands. She kept on running and as she approached the curb near the

14  medical facility, the defendant headed her off, and while he was

15  approximately one foot away from her, she saw him cock the rifle and

16  saw what appeared to be a shell flying away from the weapon. She

17  continued to run and then felt something hit her in the back of the

18  head, thinking at first she had been struck by the butt of the rifle.

19  She indicated "I never thought he would shoot me". Mrs. Totten said

20  that she believes she instantly fell and, although she thought she fell

21  either backwards or to the side, she suffered facial injuries

22  consistent with having fallen forward. She said she felt that she was

23  initially unconscious for what seemed to be a long time but, according

24  to witnesses' testimony in the case, she was evidently only unconscious

25  for a short period of time. She said that she cannot recall having

26  been nudged by the defendant's foot, as claimed by one witness. She

27  recalled placing her hand on the back of her head and seeing that she

28

TOTTEN, Anthony Lee                                          Page 10

1   was bleeding profusely.  She said that she believes that she again was

2   rendered unconscious because her next perception was seeing a nurse

3   standing over her, administering aid.  She said that she believes she

4   then went "in and out" of consciousness as her next perceptions were

5   that numerous medical practitioners were standing nearby.

6             The victim was asked to describe the nature of her injuries.

7   She said she suffered a gunshot wound to the left rear of her head and

8   that the projectile entered her left ear canal, totally destroying her

9   hearing on that side.  The bullet then traveled through her left lower

10  jaw and ultimately shattered against her left cheekbone.  She was flow

11  by helicopter to Hoag Hospital for emergency treatment (in Newport

12  Beach), but was later that date returned to Kaiser Permanente Hospital

13  where she remained over the next three days.  She was discharged from

14  the hospital on the Thursday following the shooting, but had to return

15  that evening as she began suffering abdominal contractions and her

16  obstetrician felt she should be monitored, at least overnight.  She wa

17  released the following morning.  She pointed out that she has undergo

18  two surgeries on her left ear and one on her jaw.  Following the jaw

19  surgery, her mouth was wired shut and consequently she was on a liqui

20  diet which ultimately caused her to lose 15 lbs.  She pointed out,

21  however, that the child she was carrying at the time of the shooting

22  was born without any type of handicaps.  Mrs. Totten stated that she

23  remains in medical treatment at this time and will hopefully not have

24  to have any other surgery.  She has completely lost the hearing of he

25  left ear and has a permanent restriction of the jaw movement, as well

26  as apparent permanent loss of feeling on her upper left teeth.  While

27

28

1  she suffered temporary dizziness because of her injuries, she indicated

2  she no longer suffers from that problem.

3       The victim said that Kaiser Permanente Insurance Co. covered

4  all of her medical expenses.  She pointed out that her emergency bill

5  from Hoag Hospital for one afternoon of treatment came to $9,000, but

6  that was completely paid by Kaiser.  She stated she has no idea how

7  much her total medical treatment cost.  She also indicated that she

8  missed five months of work because of her injuries, but since she had

9  disability coverage and also received assistance from her mother, other

10  family members and the Victim Witness Fund, she did not have any

11  significant financial losses.

12       The victim was asked to comment concerning what she felt to

13  be an appropriate sentence in this case.  She offered the following

14  statement:

15       "I think Tony should go to prison for as long as
   possible.  He doesn't care what he does or who he
16   hurts.  He thinks he should be allowed to do anything
   he wants and get away with it.  I remain fearful of
17   him.  He'll do it again.  If he gets like a slap on
   the hand it's like giving him permission to go out
18   and buy a gun and do it again.  He has no remorse for
   what he has done.  It's like a big joke.  My brother,
19   Tim, saw him laughing and joking with his mother and
   girlfriend right after he was found guilty.  He has
20   been found guilty of something and he should serve a
   sentence.  I've been in hiding for over a year
21   because he's been out of custody."

22  Mrs. Totten pointed out that during the past year, she has moved

23  residences on four separate occasions to prevent the defendant from

24  finding where she is residing.  She reiterated her strong belief that

25  the defendant should be imprisoned because of his actions in the

26  present offense.

27

28

TOTTEN, Anthony Le .

1  DEFENDANT'S STATEMENT

2          The defendant offered a written statement which he delivered

3  to the probation officer by fax transmittal.  His statement is included

4  in its entirety for the Court's consideration:

5          "Janet and I had been separated off and on since
           February of 1990.

6
           "In July, 1990 I went into U.C.I. Medical Center for
7          depression.  I felt abandoned by everyone., my
           feelings were confused at that time, about all phases
8          of my life.  I felt I couldn't make a decision on
           anything.  My fear while I was at U.C.I. was that
9          later my wife would use my hospitalization against
           me.  Janet was unwilling to take part in my recovery,
10         but wanted to continue our relationship.

11         "In August Janet moved in with me at Executive Suites
           Motel for six weeks, thats then I found out that
12         Janet was 4 months pregnancy.  I felt a termination
           of the pregnancy would be best, she would not hear of
13         it.  Janet knew I was seeing someone off and on for
           the past 1 1/2 years prior to this.

14
           "In October I had made the decision to file for
15         divorce.  The 25th and 26th of October we went into
           Mediation, and Janet checked every box on the sheet
16         of paper and told them about my hospitalization.
           They set up monitered visitation with my children.  I
17         was seeing my children on Tuesday and Thursdays for
           approx. 6 months.  I felt monitered visitation was
18         Janet's way of getting back at me for filing for
           divorce and because she did not want me to take the
19         children around my girl friend.

20         "Saturday the 27th, Janet called my mom and told her
           I could see my kids Sunday without being monitered.
21         She said it was alright if I took them to the park.
           The order states I could see my kids from 9:00 to
22         5:00, I only got to see them from 10:00 until 3:00.
           I hadn't done anything to my children to be treated
23         this way.

24         "Tuesday the 30th of October I knew Janet had a Dr's
           appointment at Kaiser, because I had been to her
25         previous appointments with her.  I went to talk to
           her about the monitered visitations.  When I told her
26         I had a gun, she started leaning on the horn.  I
           grabbed her arm, she reached over the seat and
27         grabbed the gun and fired 2 shots, which hit me in
           the leg.  Janet got out of the car and ran.  I

28

followed behind her and the gun went off.  I ran and
threw the gun in the trash, I was scared and
confused.  I went to the shopping center where I
called my girlfriend.  I called my attorney and
turned myself in the next day.  If I could take back
that day I would.  It was a domestic quarrel that got
out of control.  My intent was not to harm Janet.  I
feel bad for what happen."

As to a potential disposition in this case, the defendant

offered the following written statement concerning the present offense

"I feel that incarceration would have psychological
hardship on my children and family as well as myself.
No more than 2 years jail time and probation, this
was an isolated incident.  I was emotionally upset, I
over reacted on Tuesday.  I know I make a serious
mistake.  If given the chance I can prove that I am a
self productive individual who is ready, able willing
to do my part to make things better.  I'm also
willing to do community service.  I would like to
start my own business, so I can take care of my
children, and I can't do that by sitting in prison.
I will abide by all the rules and regulations the
probation office puts on me.  I will pay any
restitution the court orders me to pay.

"I am attending 3 types of counseling and have been
doing so for about a year.
Parents Annonomys
Family Services
Parenting Classes"

The defendant was personally interviewed at the Probation

Department on December 23, 1991.  At that time, he offered additional

verbal statements concerning the written statement he had previously

submitted to the probation officer by fax transmittal.  As to his prior

hospitalization at the University of California at Irvine Medical

Center, he indicated that it was a voluntary admission and that he

spent six days in the hospital because he was experiencing suicidal

ideation.  When he was later released he was initially taking

prescribed Tofinal, but he is not taking any type of medication at

present.  The defendant said that, as to his relationship with the

1    victim, they had been living apart for quite some time due to

2    relationship difficulties and she was well aware he was seeing Georgia

3    Quill.  He acknowledged that during a sexual contact he had with his

4    wife, however, she became impregnated and he explained that in August,

5    1990 when he found out she was four months pregnant, he suggested she

6    have an abortion due to the problems they were experiencing.  She

7    declined to have an abortion, however, and apparently she had the

8    backing of her family members in that position.  The defendant

9    explained that on October 27, 1990, Janet curtailed his visitation

10   hours with his children and told him, "That was the way it was going to

11   be."  He said that an apparent conflict with her schedule prompted her

12   to shorten the visitation and he acknowledged being upset by that.  On

13   the day of the shooting, the defendant, in fact, brought a gun to the

14   Kaiser Permanente Facility and when the probation officer asked him why

15   he had done so, he replied, "I brought the gun there for myself.  I was

16   seeking sympathy.  I couldn't understand why I couldn't see my kids."

17   The defendant said that when the victim realized he had a gun in her

18   car she started honking the horn and he grabbed her arm to ask her why

19   she was doing that.  The defendant maintained that the victim herself

20   initiated the shooting incident by grabbing the gun and firing it twice

21   in the vehicle striking him in the leg once.  He said that during his

22   trial, she testified that she had prior experience firing bolt action

23   .22-cal. rifles, both during her first marriage and as a teenager.  The

24   defendant acknowledged he was initially unaware he was shot (he did no

25   discover he had been injured until he arrived at the laundromat where

26   he hid for 45 minutes after the shooting), but he said that he ran

27   after Janet after the two shots were fired in his car to ask her why

28

1   she had done that.  The defendant claimed that when his gun discharged,

2   it did so accidentally, apparently striking the victim in the back of

3   the head.  He denied that he was aware she had been shot and felt that

4   she had simply fallen to the ground.  The defendant was asked to

5   elaborate upon his reasons for bringing the gun to the location of the

6   shooting to begin with and he stated that he had suicidal intentions at

7   that time.

8          As to a disposition in the case, the defendant said that he

9   would like to qualify for probation and no more than two years in

10  Orange County Jail.  He said that the thought of going to prison is

11  "scary" and he said that he is needed in the community to support his

12  children.  The defendant maintained that he feels he did not get a fair

13  trial and as to the victim, "She didn't get nothing."  He was asked to

14  explain that comment and he said that since she shot him, he feels she

15  should have been charged with something.  He acknowledged it was wrong

16  to bring his gun to the scene of the confrontation and wrong to have

17  hurt Janet, but he again maintained that she initiated the shooting an

18  when she was struck in the head, it occurred accidentally.

19  STATEMENT OF REFERENCES AND INTERESTED PARTIES

20         On December 19, 1991, letters were forwarded to Detective

21  Mason and Detective Howell of the Huntington Beach Police Department

22  soliciting any input they cared to share for consideration in the

23  current report.  As of the date of the dictation of the report

24  (December 23, 1991) the only response received was from Detective

25  Howell.  He indicated that he had not personally met the defendant

26  during the investigation of the offense, but that his review of the

27  various police documents and evidence showed that the defendant, in hi

1  opinion, "orchestrated a plan to murder his wife." He pointed out that

2  the defendant was "lying in wait" and that, "This was certainly no heat

3  of passion situation." He said that subsequent to the victim having

4  been shot, the defendant had the opportunity to "drag her into the

5  hospital" for treatment, but he did not do so. He also pointed out

6  that it appears the defendant later hid in a laundromat after the

7  offense and watched members of the Huntington Beach Police Department

8  searching for him. As to a disposition in this matter, Detective

9  Howell said, "Poor marksmanship is no reason to give someone

10 probation."

11       On December 17, 1991, letters were forwarded to the

12 defendant's defense attorney and to Deputy District Attorney Cheryl

13 DeCant. A subsequent response was received from Deputy District

14 Attorney DeCant. She said that it appeared the defendant had been

15 "very controlling" of the victim during their marriage and had a

16 history of involvement in violent or threatening acts against her. She

17 pointed out that several prior police reports document the defendant's

18 violent nature and they chronicle his campaign of threats and

19 harassment. She pointed out that on several days prior to the offense

20 the defendant made repeated telephone calls and/or personal threats

21 where he told Mrs. Totten she would be killed. She indicated that

22 during her involvement in this case, she had received information that

23 the defendant had been trying to obtain an untraceable gun from a

24 methamphetamine "dealer" in the Lake Elsinore area. She pointed out

25 how ludicrous his claims that he intended to commit suicide "with the

26 rifle" were, if, in fact, he was attempting to obtain an untraceable

27 handgun. She said that when the defendant and his estranged wife

28

TOTTEN, Anthony Le_                                                    Page 17

1  attended a child custody mediation hearing in Orange County Superior
2  Court on October 26, 1990, while he was represented by an attorney and
3  she was not, she won the various concessions. Subsequent to that
4  hearing, the defendant reportedly asked her when her next doctor's
5  appointment was at Kaiser Permanente Hospital and Ms. DeCant offered
6  her opinion that the defendant was fully aware the victim never took
7  her children or any other witnesses to the doctor and consequently
8  would be alone so he could commit the offense without being recognized.
9  She stated that it appeared he became increasingly angry over the
10 result of the child custody mediation and over approximately a four-day
11 period prior to the shooting he became very quiet and did not go to
12 work. She stated that he clearly went to great lengths to disguise the
13 box in which he carried the rifle by repeatedly spray painting it to
14 cover up printing on the box. She said there was no question in her
15 mind that when Mrs. Totten began struggling with the defendant for the
16 control of the weapon "she was afraid for her life", and the
17 defendant's claims that she shot him with the gun are "ridiculous" as
18 "she knows nothing of guns." She pointed out that after Mrs. Totten
19 was able to escape from the parked vehicle in which she and her
20 estranged husband initially struggled, he chased her down and "pumped
21 another live round into the rifle" with the result that an unfired
22 cartridge was ejected from the weapon (and was later found near the
23 victim). She stated that it appears the defendant aimed at the victim
24 from approximately ten feet away and deliberately shot her in the back
25 of the head. She fell to the ground and he approached her and nudged
26 her with his foot and then fled from the scene. After discarding his
27 gun he later called his girlfriend (with whom he was engaged in an
28

1   extramarital affair) and she picked him up and drove him from

2   Huntington Beach. Ms. DeCant stated that, in her opinion, the

3   defendant has shown absolutely no remorse throughout the trial, and she

4   knows of no attempt he made to check either on Mrs. Totten's condition

5   or that of their unborn child after the offense.  She also pointed out

6   that it appears the defendant was unaware he had been shot in the leg

7   until approximately 45 minutes after the offense which, in turn, would

8   "shoot down the theory of self-defense."  She pointed to the serious

9   trauma the victim underwent and said she hopes the Court will consider

10  the aggravated sentence on the great bodily injury and use of a weapon

11  allegations and then add a consecutive sentence for the offense itself.

12  She expressed her concern that the Court (apparently having substituted

13  in, part-way through the trial) would not be fully aware of just how

14  premeditated the offense was and how terrorized the victim was at the

15  hands of the defendant.  She said that she strongly feels the defendant

16  is "very dangerous" and that his contentions that he intended to commit

17  suicide (explaining his possession of the weapon) "just doesn't make

18  sense."

19           The defendant supplied nine letters of reference from family

20  members and acquaintances to be considered in his behalf.  Those

21  letters are attached for the Court's consideration.  The defendant's

22  father, 54-year-old Jason Totten, indicates the defendant has an

23  outgoing personality, but a low self-image.  He said that he feels the

24  defendant would benefit from counseling and probation much more than

25  incarceration.  He points out that he has been involved in counseling

26  during the past year and that there has been a "big difference in his

27  attitude."

28

TOTTEN, Anthony Lee                                              Page 19

1          The defendant's 51-year-old mother, Gana Totten, also

2    referred to the defendant's "low esteem," but indicates that his

3    involvement in the past 12 months in a counseling program has been

4    helpful to him.  As to the offense, she offers her opinion that, "I

5    feel this was a once in a lifetime mistake that would not be repeated."

6    She said she feels probation and counseling would be beneficial and she

7    pointed out that he has no prior arrests.

8          The defendant's 31-year-old brother, Perry Totten, also

9    appears to favor probation and counseling.

10         The defendant's 42-year-old uncle, Wayne Stout, refers to the

11   defendant as being "very emotional" and "temperamental."  He points out

12   that the defendant has shown concern over his children and he offers

13   his opinion that, given the circumstances surrounding this offense,

14   "there are any given number of people that would or could (have) done

15   the same things Tony has done."  He also acknowledged that the offense

16   "could have been a result of drug use."  He refers to the offense as

17   being an isolated, extreme incident.

18         The defendant's 64-year-old grandmother, Helen Dannels,

19   indicates the defendant is a good worker who has a strong love for his

20   children.  She said that when his visitation of the children was

21   limited, "he became very upset", which led to the offense.  She offered

22   her opinion that, during the past year while he was out on bail, "He

23   has been on probation for a year and has not broke it in any way".

24         The defendant's stepgrandfather, Robert Dannels, referred to

25   the defendant as being a "very caring person" and he said that, if he

26   is given a chance, he will "prove himself."

27         The defendant's 34-year-old fiance, Georgia Quill, states

28

TOTTEN, Anthony Le_                                              Page 20

1  that the defendant works hard to provide for his children and became

2  "very emotional" when visitation over those children was limited by th·

3  mediation hearing.  She has an eight-year-old son and she stated that

4  over the past year, the defendant has been a "wonderful stepfather" to

5  .the boy.  She indicated her opinion is that, if the defendant had to g

6  into custody, it would be a disservice to "everyone involved."  She

7  refers to the offense as having been "an isolated incident" and she

8  appears to favor a probation grant.

9        The defendant's 32-year-old friend, Jim Yapp, refers to the

10 defendant as being a hardworking, dependable, and loyal individual.

11       The defendant's 52-year-old friend, Sondra Kleinhans, states

12 that the defendant is a "friendly, dependable, organized, caring

13 individual" who is "devoted to the care of his children."  She

14 acknowledges that he has difficulty with money management and also .

15 appears to have low self-esteem.  She stated that since the defendant

16 became involved in counseling, he appears to be "more mellow" and more

17 decisive.  She states:

18         "As this situation arose out of the culmination of an
            unfortunate marital dispute, which tested everyone's
19         emotions to the limit, it would appear to me that
            probation with intense counseling would be
20         appropriate."

21       A letter addressed, "To whom it may concern" has been

22 received from Janice A. Tanner who indicates she holds a Master of Ar·

23 Degree.  She is the facilitator for the South Orange County Chapter o·

24 Parents Anonymous.  She stated that the defendant has been involved i·

25 group meetings with that organization over the past 11 months and has

26 been found to be "honest" in his efforts to establish a relationship .

27 with his girlfriend's son, and he has expressed his "frustration with

28

1  having no contact with his children", She indicated that the defendant

2  "verbalizes a strong desire to continue his own development and

3  learning process" and she said "his motivation toward change is

4  strong."

5         A letter was received from the defendant's 34-year-old

6  sister, Kip Kibler.  She refers to her brother as being "always helpful

7  towards friends and family," and she indicates that in the past several

8  years the defendant has been "learning to deal with the heartaches life

9  can sometimes bring us."  She indicates she believes incarceration

10  simply serves to protect society from an individual and she offered her

11  opinion that the defendant is not a danger to society.  She states she

12  would like to see him receive "the proper guidance and counseling" to

13  help him "remain an honest citizen."  She also said she feels it would

14  be detrimental to his children not to have their father as they grow

15  up.  She asked that the Court "just give him a chance."  Mrs. Kibler's

16  letter is attached for the Court's consideration.

17         A letter was received from Robert Shovlin who identifies

18  himself as a retired police sergeant.  He stated that the defendant has

19  always been "fair and honest" in his relationship with Mr. Shovlin and

20  he states that the defendant is very sad about his present situation

21  and would like to rectify it.  He states the defendant has made

22  comments to him to the extent that he would like again to have a close

23  relationship with his children.

24  PSYCHOLOGICAL REPORT

25         A letter has been received from J. Digby Henry, the District

26  Director of Family Service Association of Orange County.  He indicated

27  that the defendant began a counseling program with him on September 19

28



1  1991. He has subsequently been in attendance at a total of eight

2  psychotherapy sessions during which the counseling focused on his

3  relationship between himself and Georgia Quill and her child by a prior

4  union.  Mr. Henry also indicated that counseling has focused on the

5  defendant's "recent court proceedings" as well.  Mr. Henry's letter is

6  attached for the Court's consideration.

7  PRIOR RECORD (FBI #558215MA2, CII #A09599685, OCSO #753780)

8         According to records of the Federal Bureau of Investigation

9  and California Department of Justice, the defendant has no prior record

10  of any type of criminal activity.

11        Records of the California Department of Motor Vehicles

12  indicate the defendant holds a valid class-C driver's license with no

13  reported departmental actions, failures to appear, nor accidents.  He

14  has one conviction for a vehicular violation (in 1989).

15  SOCIAL HISTORY

16        According to the defendant, he is the second of two children

17  born to the union of his mother and Gary Zinn.  His natural parents

18  were apparently divorced in 1959, and that same year the defendant's

19  mother married Jason Totten.  The defendant and his older sister were

20  adopted by Mr. Totten; the defendant stated he did not find out about

21  the adoption until he was 14 years of age and he acknowledges he had

22  difficulty adjusting to that information.  He stated that his mother

23  subsequently had a son and daughter (the defendant's half-siblings)

24  born to her second marriage.  He referred to his family life as having

25  consisted of a great deal of dissension and he characterized his famil

26  as having been dysfunctional.  He said that he did not know what was

27  expected of him as a child and had difficulty with reading, which

28

TOTTEN, Anthony Le_                                           Page 23

1   ultimately caused him to become "so nervous in first grade (he) ran

2   home from school every day for the first two weeks." He stated,

3   "School scared the hell out of (him)." He ultimately adjusted to

4   school, however, and later became involved in extracurricular

5   athletics.   The defendant said that his adoptive father "drank a lot"

6   and was not always consistent in his child-rearing practices.   The

7   defendant said that he felt his adoptive father expected a great deal

8   out of him and that the defendant did not always live up to those

9   expectations.  He indicated that he has only seen his natural father

10  approximately five times since the parents were divorced and even

11  though Mr. Zinn resides in southern California, the defendant "can't

12  understand his behavior towards (him)."  The defendant said that his

13  mother was "the glue that held things together"  and that, while she

14  would occasionally "yell and throw things", particularly as connected

15  to her husband's drinking, she was considered "the peace maker."

16          The defendant last attended school at University High School

17  in Irvine in 1976.  He dropped out after having completed just the 11t

18  grade.  He reports he has primarily been employed as a tile setter

19  during his adult years and currently earns approximately $2,800 monthl

20  from his work endeavors.

21          The defendant married Janet, the victim of this case, on

22  February 9, 1985.  He indicated they had an acceptable relationship fc

23  approximately three years, but then began "drifting apart."  He

24  acknowledges paternity of three children born to their union.  While I

25  told the probation officer that he believed his divorce from Janet was

26  final in October, 1990, during her personal interview at the Probatior

27  Department, Janet stated that, while the paperwork on the divorce had

28

TOTTEN, Anthony Lee

1  been turned in, she does not know whether or not the union has

2  officially been terminated to date.  The three children reside with

3  their mother (at an undisclosed location) and they are under the

4  current supervision of the Orange County Department of Social Services

5  due to the nature of the defendant's offense.

6          Mr. Totten is currently residing with his parents in their

7  dwelling in Laguna Hills.  He reportedly pays them $250 monthly in ren

8  and pays his various personal financial obligations out of his

9  earnings.  It is noted in a written financial statement which he

10 provided to the probation officer, he claimed to be paying support or

11 alimony of $932 monthly.  During her personal interview at the

12 Probation Department, Mrs. Totten denied that she was receiving any

13 type of financial assistance from the defendant.  The defendant relate

14 that he has no assets and has liabilities "including attorney's fees

15 and bail" totaling $55,800.

16 DISCUSSION AND EVALUATION

17         Appearing before the Court for sentencing at this time is 33

18 year-old Anthony Lee Totten who has been found guilty of attempted

19 murder following jury trial.  It appears, in 1985 the defendant marrie

20 the victim of this case, Janet Totten, and apparently began

21 experiencing marital difficulties with her three years later.  He

22 acknowledges being involved in an extramarital affair for approximate]

23 18 months and began experiencing increasing acrimony between himself

24 and his wife beginning in 1990.  Several police reports throughout tha

25 year appeared to chronicle the deteriorating nature of their

26 relationship, and there appeared to be indications the defendant

27 harassed and threatened his wife as their relationship continued to

28

TOTTEN, Anthony Lee                                              Page 25

1   deteriorate. Connected to their anticipated divorce, the defendant and

2   the victim of this case attended a child custody mediation hearing in

3   Orange County Superior Court. The result of that hearing required that

4   future visitation between the defendant and his children be monitored.

5   The defendant evidently became very distressed over that condition and

6   was further angered when his estranged wife sought and obtained a

7   temporary restraining order enjoining him from approaching her from

8   closer than 100 yards. Several days prior to this offense, the

9   defendant purchased a .22-caliber rifle and evidently went to some

10  extent to disguise the box in which it was contained by applying

11  multiple coats of paint to the box. On the day of this offense, the

12  defendant, being aware that his estranged, pregnant wife was attending

13  a doctor's appointment in Huntington Beach, apparently parked his

14  vehicle out of her view and later approached her on foot (carrying the

15  rifle) as she entered her parked car. His initial demeanor was

16  evidently calm as he convinced the victim to accept a "present" (the

17  rifle in the box) for their daughter. He placed the box in her car and

18  then asked her to give him a ride to the rear of the medical facility

19  where he reportedly was employed. She agreed to his request and after

20  he had entered the passenger side of her vehicle, he reportedly became

21  upset with her and began to retrieve the rifle from the box. The

22  victim, fearing for her life, engaged in a struggle with her husband

23  and, during that struggle, two shots from the bolt-operated rifle were

24  discharged inside the vehicle. One of those shots struck the defendant

25  in the leg. The victim attempted to flee from the scene of the

26  conflict on foot, but was pursued by the defendant. He evidently

27  operated the bolt action on the rifle once again, chambering a live

28

1  round (and ejecting a live round onto the ground near the ultimate

2  scene of the shooting).  He then shot the victim in the back of the

3  head before fleeing from the scene on foot.  The following day, he

4  turned himself in and, after receiving medical attention to his leg

5  wound, he was taken into custody on the present charge.

6          During the present investigation, the defendant has offered

7  statement in which he claims the victim had initiated the gunfire by

8  grabbing the gun when she learned he was in possession of it and firin

9  two shots at the defendant, one of which struck him in the leg.  He

10 claims that subsequent to those two shots being fired, the victim flec

11 from the location on foot, followed by the defendant.  He appeared to

12 claim the gun discharged accidentally, striking her in the back of the

13 head.  It is clear, through the jury's verdict, the defendant's

14 rendition of this offense was not believed.

15                  CIRCUMSTANCES IN AGGRAVATION

16

17 The Crime:

18          421(a) - 1    Clearly, this offense involved great violence

19                        disclosing a high degree of cruelty,

20                        viciousness or callousness in the defendant.

21          421(a) - 3    It is felt the unarmed fleeing victim was

22                        particularly vulnerable to the defendant's

23                        predatory actions.

24          421(a) - 8    It appears the offense was pre-planned.  The

25                        defendant brought the rifle to the scene of t

26                        offense in a disguised box, misrepresented as

27                        "present" to get it into the victim's presenc

28

TOTTEN, Anthony Lee

1   The Defendant:

2            421(b) - 1    The defendant engaged in violent conduct, which

3                            indicates a serious danger to society.

4                      CIRCUMSTANCES IN MITIGATION

5   The Crime:

6            423(a)          Not applicable.

7   The Defendant:

8            423(b) - 1    It is noted Mr. Totten has no prior record of

9                            any type of criminal activity.

10           423(b) - 3    It is noted the defendant voluntarily turned

11                         himself in for this offense on the day after i

12                         occurred, although it is noted he initially hi

13                         from police officials.

14                      PROBATION ELIGIBILITY

15           413(a)          The defendant is ineligible for probation as h

16                         was convicted of a violation of Section 664/18

17                         of the Penal Code and the allegation regarding

18                         Section 1203.06(a)(1) of the Penal Code was

19                         found to be true.  It is also noted Section

20                         1203.075(a)(1) appears to prohibit probation.

21       The probation officer has determined the defendant is a

22   person required to pay a fine under Section 13967 of the Government

23   Code.  Further, it appears he has the present ability to pay a fine in

24   the amount of $10,000.00.

25       Bearing in mind the significance of this offense and the

26   defendant's ineligibility for probation, it is evident the only

27

28

TOTTEN, Anthony Lee

1  recommendation which can be tendered at this time is for the denial of

2  probation.

3  RECOMMENDATION

4        In view of the foregoing, it is respectfully recommended that

5  probation be denied and that the defendant be required to pay a $10,000

6  fine in accordance with Section 13967 of the Government Code.

7                                        Respectfully submitted,

8                                        MICHAEL SCHUMACHER
                                      Chief Probation Officer

10                                       [signature]

11                                       Bruce R. Carel
                                      Deputy Probation Officer

12                                       569-2102

13 Dated this 3rd day of January, 1992.

14 I have read and considered the foregoing
   report of the Chief Probation Officer.
15

16 _____

17

   JUDGE OF THE CENTRAL SUPERIOR COURT
18

# EXHIBIT    "3"

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

DEC 1 5 2004

ALAN SLATER, Clerk of the Court
C. Neuenschwander
BY C. NEUENSCHWANDER

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF ORANGE

| | |
|---|---|
| In re | CASE NO. M-10386 |
| ANTHONY TOTTEN, | |
| Petitioner, | ORDER |
| ON HABEAS CORPUS. | |

TO THE PETITIONER AND THE OFFICE OF THE ORANGE COUNTY
ATTORNEYGENERAL OF THE STATE OF CALIFORNIA, HAVING RECEIVED THE
PETITION FOR WRIT OF HABEAS CORPUS, THE COURT FINDS AND ORDERS AS
FOLLOWS:

I

Petitioner was convicted by a jury of attempted first degree murder with use of a firearm
in 1991. According to the statement at his parole hearing, Petitioner entered the vehicle of the
victim, who was his wife, with a rifle. She screamed, a scuffle ensued, and two shots were fired
in the vehicle. She managed to escape from the car; he followed her and shot her in the back of
the head. Petitioner was sentenced to life plus three years for the crime.

Petitioner's third parole hearing was held before the Board of Prison Terms (BPT) in June
2004, and parole was denied for two years. In denying parole, the BPT stated that in concluding
Petitioner was not suitable for parole and posed an unreasonable risk of danger to society, it
relied on the commitment offense and his current psychiatric evaluation which was unfavorable.
It also noted opposition to release by the District Attorney.

1

II

Petitioner argues the BPT failure to set a parole date violated California statutes, BPT regulations, case law, and his state and federal rights to due process. Further, he states there is no evidence that he is a current or unreasonable risk to society. Lastly he states the hearing was a sham and a farce which also violated his state and federal rights to due process.

III

A petition for a writ of habeas corpus is the proper vehicle to address a claim that the BPT abused its discretion in denying parole. (*In re Powell* (1988) 45 Cal.3d 894, 903.) The petition should be heard in the court which rendered judgment. (*In re Sena* (2001) 94 Cal.App.4th 836.) Thus this court may address the petition on its merits.

A BPT parole decision is subject to a limited judicial review, and the applicable standard is whether "some evidence" supports it. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 626; *In re Powell, supra*, 45 Cal.3d at pp. 902-904; *In re Scott* (2004) 119 Cal.App.4th 871; *In re Van Houten* (2004) 116 Cal.App.4th 339, 347.) To obtain relief, Petitioner must therefore show the BPT acted without a factual basis or made a decision based on whim, caprice, or rumor. (*In re Powell, supra*, 45 Cal.3d at pp. 902-904.) Petitioner does not make that showing here. The BPT relied on the commitment offense and on Petitioner's psychiatric evaluation in making its decision. It also mentioned opposition by the District Attorney.

Whether the commitment offense may provide a sufficient basis for a denial of parole was addressed by the court in *Van Houten*. That court concluded that it could, as long as the crime involved particularly egregious acts beyond the minimum necessary to sustain the conviction. (*In re Van Houten, supra*, 116 Cal.App.4th at p. 348.) The issue of whether that is true in Petitioner's case need not be addressed here, because the BPT also relied on the psychiatric evaluation.

The evaluator stated that Petitioner "is on the road to becoming a penitent human being." The evaluator believed, however, that Petitioner had "further to go" before it would be reasonable to release him. According to the evaluator, Petitioner "had some of the right answers" but seemed more able to talk about the crime affected **him** rather than how it affected his former wife and their children. The evaluator described Petitioner as "self-centered" and concluded that it was unclear whether Petitioner would be a low risk for violence once outside prison.

2

The issue of whether opposition by the prosecuting agency is "relevant" and "reliable information" (Cal. Code Regs., tit. 15, § 2281, subd. (b)) that may be relied on by the BPT in making its decision also need not be decided here. This is so because the psychiatric evaluation is "some evidence" which supports the BPT finding. Only a "modicum" is required. (*In re Van Houten, supra*, 116 Cal.App.4th at p. 351.)

Petitioner thus fails to show the BPT acted without a factual basis, that its decision was based on whim, caprice, or rumor, or that it abused its discretion in denying parole. (*In re Powell, supra*, 45 Cal.3d at p. 902; see also *In re Rosenkrantz, supra*, 29 Cal.4th 616.) The petition is denied on that basis. (*Ibid.*)

IV

The petition for a writ of habeas corpus is DENIED.

DATED: 12/15/04

JUDGE OF THE SUPERIOR COURT

DANIEL J. DIDIER

3

# EXHIBIT    "4"

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
JANUARY 2004 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
NOVEMBER 19, 2003

This is a psychological evaluation for the Board of Prison Terms for inmate Anthony Totten, CDC# H-21049. This report is based upon a personal clinical interview of the inmate, conducted on 11/19/03, as well as a review of his Central file and unit health record. This clinical interview and a review of all pertinent documents were for the express purpose of preparing this report.

## PSYCHOSOCIAL ASSESSMENT

I.    **IDENTIFYING INFORMATION:**

Inmate Totten is a 45-year-old, twice married, Caucasian male who was born on 07/03/58. He stated that he uses no aliases or nicknames. He has no obvious unusual physical characteristics.

II.    **DEVELOPMENTAL HISTORY:**

Inmate Totten stated that he knew of no prenatal or perinatal problems surrounding his birth, and that he had no birth defects.

It should be noted that, when being interviewed for his Board of Prison Terms report, he stated that he had been diagnosed with ADHD when he was about six or seven. Though he initially said he had no problems in childhood, he added that he had been abused by his adoptive father, both physically and emotionally. He had only a few contacts with his biological father. He went on to say that he had never engaged in animal abuse or arson.

III.    **EDUCATIONAL HISTORY:**

Inmate Totten said that he never attended any special education classes. His sister indicates that he quit school when he was in the 11th grade (finally getting his GED in 1993). After quitting school, he worked with his stepfather, and continued working as a tile setter in prison. He will continue working as a tile setter if granted parole.

IV.    **FAMILY HISTORY:**

Inmate Totten reported that he is the second oldest of four children (two girls and two boys). His two younger siblings were born to his mother and stepfather,

TOTTEN        H-21049        CTF-CENTRAL        11/19/03        gmj

TOTTEN, ANTHONY
CDC NUMBER: H-21049
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

while he and his older sister were born to his mother's previous husband—his biological parents separated when he was still an infant. His biological father has died within the last few years. His stepfather, an alcoholic until only a few years ago, was an abusive man (nevertheless, the inmate tried to model much of his behavior after that of his stepfather). In addition, the inmate's older sister and a brother have had problems with substance abuse. He said that his family is very supportive of him.

V.     **PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:**

Inmate Totten said that he is definitely heterosexual, and has always treated females with respect, denying any sexually-related, high-risk behavior. He started dating in his mid-teens.

VI.    **MARITAL HISTORY:**

Inmate Totten said that his first wife separated from him when she found out that he had been having an affair. They have three children by this marriage. He has not seen either his ex-wife or his children for many years. Apparently, his second wife moved twice to follow him when he was transferred from one prison to another. He divorced his second wife in the last couple of years so that she can "go on with her life." They remain friends.

VII.   **MILITARY HISTORY:**

Inmate Totten has not served in any military organization, either in the United States or abroad.

VIII.  **EMPLOYMENT/INCOME HISTORY:**

As noted above, inmate Totten started working with tile professionally when he quit school and went to work for his father. Inmate Totten stated that he remains a member in good standing of the Tile Setters' Union. He has practiced this trade for many years, and has used it to support himself and his family.

IX.    **SUBSTANCE ABUSE HISTORY:**

Inmate Totten said that he used marijuana briefly at about the age of 15. He did not use any other drug for about ten years after that, until he started using methamphetamine. He began using methamphetamine over the weekends for about three years, until he committed his life crime.

X.     **PSYCHIATRIC AND MEDICAL HISTORY:**

Besides his methamphetamine dependence, inmate Totten indicated that, as a consequence of his drug use, he had developed suicidal ideation. He said to this interviewer that he no longer feels suicidal; the effects have worn off.

TOTTEN          H-21049          CTF-CENTRAL          11/19/03          gmj

TOTTEN, ANTHONY
CDC NUMBER: H-21049
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

XI.    <u>PLANS IF GRANTED RELEASE</u>:

If granted parole, inmate Totten states that he would move to San Juan Capistrano to live with his parents. He said that they initially will provide him with support until he gets back on his feet. He will update his tile setter union membership, and resume work as a tile setter. He also wants to attend Narcotics Anonymous.

## CLINICAL ASSESSMENT

XII.    <u>CURRENT MENTAL STATUS/TREATMENT NEEDS</u>:

Inmate Totten was clean and well groomed when he appeared for the interview. He was fluent, and presented with good eye contact. He did not appear to have any psychotic processing or mood disorder. His intelligence was in the average range or higher.

### CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:    305.70 – Methamphetamine Dependence, in remission in a controlled environment.
                Rule Out ADHD.
AXIS II:    Deferred.
AXIS III:    No Contributory Physical Disorder.

Inmate Totten's current level of care is general population, and he is not taking any psychotropic medications.

XIII.    <u>REVIEW OF LIFE CRIME</u>:

Inmate Totten stated that, at the time of his crime, he had had a methamphetamine problem for a few years. Though he had been married for seven years, he was also having an affair with another woman, and his wife found out and sued for divorce, taking the children with her. Thus, he was under considerable stress. After having a series of anger-filled meetings with her, he arranged to meet his wife again, this time at a hospital where she was having a checkup (he said he had hoped to show her how distraught he was so that she would have some sympathy for him). Meeting her, he escorted her to her car, where he took out a rifle he had placed in a box, and a struggle soon ensued. During the struggle, he was shot in the leg. He then followed her out of the car as she attempted to run away, and he shot her. She recovered, and he went to prison.

In discussing his crime, he went on to say that he had not intended to kill his wife—"If I had wanted to kill her, I would have. I was high on drugs." In further discussing this crime, he said that he had done "a bad thing."

TOTTEN    H-21049    CTF-CENTRAL    11/19/03    gmj

TOTTEN, ANTHONY
CDC NUMBER: H-21049
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

Inmate Totten then went on to describe some of the losses he has experienced since he has been in prison. He say that he has lost a grandmother, who has died since he has been in prison. Inmate Totten said he has also missed his children. He mentioned his daughter at this point, saying he would like to talk to her. He also said that he exercised bad judgment, and was sitting in prison because of it. He finished by saying that he was remorseful for his actions.

He had some of the right answers for my questions, and seemed to be on the road to getting his thinking straight. However, I had to work on getting him to talk about his thinking about how his crime has affected others — he seemed to be more able to talk about its effect upon him than upon others, as if he has not quite thought through the consequences of his actions upon others. I also believe that he needs to work more on the effect of his crime on his former wife and children. In short, inmate Totten seemed to this interviewer to live in a still too-self-centered world.

## XIV.   ASSESSMENT OF DANGEROUSNESS:

His disciplinary history is quite good (he has had two CDC-128s), and he has worked and not sat still. It is likely he will continue to be a low risk for violence within the prison system. At this time, however, it seems less clear that he will be a low risk in the free community. In particular, his still seemingly self-centered view of his actions suggests that his interpersonal maturity is somewhat limited. If he truly suffers from ADHD, as he has stated, he may be somewhat impulsive, and will need help dealing with this disorder as well. It must be said that, comparing his statements to those made to earlier interviews, he seems to have advanced somewhat in his understanding and appreciation of others as people. But there is still room for growth, and needed growth will occur. Finally, he must continue to attend AA/NA classes if he is released, since this is an important source of understanding and support. In conjunction with the foregoing, he also needs to be monitored regularly to see if he is maintaining his abstinence.

## XV.   CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

Inmate Totten is on the road to becoming a penitent human being. He has further to go however, before it is reasonable that he is released.

R. TALBOTT, Ph.D.
Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

TOTTEN          H-21049          CTF-CENTRAL          11/19/03          gmj

TOTTEN, ANTHONY
CDC NUMBER:  H-21049
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

B. ZIKA, Ph.D.
Senior Supervising Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

RT/gmj

D:  11/19/03
T:  12/10/03

# EXHIBIT   "5"

MENTAL HEALTH EVALUATION
FOR THE BOARD OF PRISON TERMS
SEPTEMBER 2002 CALENDAR
LIFER PROGRAM UNIT
CALIFORNIA TRAINING FACILITY AT SOLEDAD

## PSYCHOSOCIAL ASSESSMENT

**IDENTIFYING INFORMATION:** Mr. Anthony Totten, CDC# H-21049, is a 44-year-old, divorced, white first-termer committed from Orange County. He is serving a Life Sentence Plus Three Years for Attempted First Degree Murder with Great Bodily Injury. The index offense occurred on 10-30-90, and Mr. Totten entered into CDC at Chino on 1-13-92. He arrived at Soledad on 3-1-00. He is a United States citizen.

Informed consent, including the limits of confidentiality, was provided. Mr. Totten appeared to comprehend both the nature and purpose for the present evaluation, and he agreed to participate in the interview. Mr. Totten does not appear to have a mental disability or condition that would qualify under the Americans with Disabilities Act, and it was my conclusion that it was not necessary to provide auxiliary aids or assistance to achieve effective communication. The interview was conducted on 6-28-02, lasting approximately one and one-half hours. Both the Central file and Unit Health Record were reviewed. Included in this review was Dr. R. Bradley's Psychological Evaluation for the Board dated 7-23-99.

**DEVELOPMENTAL HISTORY:** The reader is referred to Dr. Bradley's report dated 7-23-99 for the relevant aspects of Mr. Totten's developmental history.

Mr. Totten was born in Santa Monica, CA. His developmental history appears to be unremarkable. There were no indications of prenatal and perinatal concerns, or birth defects. There were no signs of developmental abnormalities. He seems to have attained developmental milestones at the appropriate times and in the expected sequence. He experienced physical abuse by his adoptive father. His childhood medical history also seems unremarkable, with the exception of Attention-Deficit/Hyperactivity Disorder (ADHD). He informed the examiner that he was diagnosed with ADHD at the age of 6 or 7, and he was treated with medication until about the age of 25.

**EDUCATION:** Per Dr. Bradley's report.

In the present interview, Mr. Totten reported that he received average to above average grades in elementary school and junior high. He stated that he was not in any special education classes. He claimed that there were no serious disciplinary problems during his years in school. While attending University High School in Irvine, he decided to drop out in the 11th grade and work for his adoptive father as a tile setter. He acknowledged that he lacked interest in academic pursuits.

His TABE test from 8-20-01 reflects a 4.5 grade placement level in reading. He previously tested at the 9th grade level. He attributed this lower score to problems with his vision.

**FAMILY HISTORY:** Per Dr. Bradley's report.

In the present interview, Mr. Totten reported that his biological father, Gary Zinn, and his mother, Gana, separated when he was about 6 months old. His biological father died from a brain tumor approximately two years ago. When he was about 2, his mother was remarried to Jason Totten, who later adopted him. His adoptive father has been in recovery from alcoholism for 16 years. As mentioned above, his adoptive father was sometimes physically abusive to family members when drinking. His mother (65) retired from working in a convalescent hospital in December 2001. His older brother, Kip (45), now works as an engineer and is divorced with 2 children. His half-brother, Perry (42), is an asphalt foreman and is married with 3 children. His half-sister, Jamie (39), works as a dental hygienist, and is married with 2 children. There is a family history for alcoholism, cancer and heart disease.

Currently, Mr. Totten has contact with his parents and siblings. He described them as "real supportive."

**PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:** Mr. Totten identified himself as exclusively heterosexual. He estimated that he reached puberty at age 13 or 14, and he became sexually active at age 16 or 17. He denied any interest in non-normative sexual behaviors or fantasies, and there are no reported sex crimes. He denied having sex with prostitutes, and he stated that he has no history for sexually transmitted diseases.

**MARITAL/RELATIONSHIP HISTORY:** Per Dr. Bradley's report.

In the present interview, Mr. Totten reported that he and his first wife, Janet Quick Totten, the victim in the index offense, had been separated for about 6 months when the index offense occurred. When the crime happened, he had an extramarital relationship with Georgia Stephans. He emphasized that Janet was upset about this relationship and she left with their children, not allowing him regular visitation. He informed the examiner that he has not had contact with Janet or his 4 children during the last 12 years.

Mr. Totten married Georgia in 1993, and they were recently divorced in 2001. He attributed their divorce to his incarceration, but he added that they still have contact and she remains supportive.

Mr. Totten also had a live-in relationship with Sandy Moore that began when he was 21 and ended when he was 26.

**MILITARY HISTORY:** There is no record of military service.

**EMPLOYMENT/INCOME HISTORY:** Per Dr. Bradley's report.

In the present interview, Mr. Totten acknowledged that he went through periods of unemployment while working as a tile setter. He volunteered that he has other construction experience.

In prison, Mr. Totten has had various job assignments. He reported that while he was at Susanville, he worked in the maintenance department, setting tile throughout the prison. For one year he worked as the R & R clerk, and he was also on yard crew. He is currently in vocational landscape. His work supervisor's report dated 3-31-02 indicates that he is a good worker and he is close to receiving certification.

**SUBSTANCE ABUSE HISTORY:** Per Dr. Bradley's report.

In the present interview, Mr. Bradley informed the examiner that he started abusing methamphetamine at the age of 28. He mentioned that he stopped taking medication for ADHD at age 25 when his prescribing physician died, and he discovered that methamphetamine had similar effects. He divulged that he was dependent on methamphetamine prior to the index offense. At one point, he admitted himself to the detoxification unit at the University of California at Irvine Hospital for 3 days, but he relapsed about 6 months later. He revealed that when the index offense occurred, he had been awake for 3 days, bingeing on methamphetamine.

A chrono dated 4-18-02 indicates that Mr. Totten has been continuing his participation in AA. He was also in the New Beginnings program.

**MENTAL HEALTH AND MEDICAL HISTORY:** Per Dr. Bradley's report.

In the present interview, Mr. Totten volunteered that after bingeing on methamphetamine for several days, he was experiencing intense suicidal ideation and he was actively suicidal when he committed the index offense.

On 2-1-00, Mr. Totten was evaluated by Dr. Frederickson who found no signs or symptoms of a mental disorder, and he was recommended for continued placement in general population.

Mr. Totten is currently not on medication for hypertension. He is also not taking medication for gastrointestinal difficulties.

**PLANS IF GRANTED RELEASE:** Mr. Totten reported that if he were released from prison, he would reside with his parents in San Juan Capistrano, CA. He stated that his father has a truck and tools and he would be able to resume his work as a tile setter. He mentioned that he has a standing job offer from his brother. He told the examiner that he has established contact with 12-Step sponsors in the community, and he intends to

continue with AA and NA. He also expressed an interest in participating in professional counseling to help him adjust to his re-entry in society.

At present, he has positive family support and a viable parole plan. Therefore, his prognosis for community living is favorable.


## CLINICAL ASSESSMENT


**CURRENT MENTAL STATUS/TREATMENT NEEDS:** Mr. Totten arrived for the interview promptly and he was neatly groomed and dressed with polished shoes. His hair was combed and he was wearing glasses. His demeanor was mildly nervous, but pleasant. He was alert and well oriented in the three spheres. His speech was normal, and his responses were adequately articulated. His mood was euthymic and affect was broad and appropriate. He did not endorse any primary symptoms of depression or hypomania. His thinking was well integrated and purposeful. There were no indications of paranoid ideation. Memory and concentration were intact. Judgment was adequate, but insight was only partial. He denied any thoughts or intentions of harm to self or others.

**DIAGNOSTIC IMPRESSION:**

| | |
|---|---|
| Axis I: | 314.01 Attention-Deficit/Hyperactivity Disorder |
| | 304.4 Amphetamine Dependence, in Full Remission in a |
| | Controlled Setting |
| | V71.01 Adult Antisocial Behavior |
| Axis II: | V71.09 No Diagnosis on Axis II |
| Axis III: | Hypertension |
| | Unspecified gastrointestinal problems |
| Axis IV: | Incarceration |
| Axis V: | GAF=87 |

Currently, Mr. Totten does not seem to have a mental disorder and he is not in need of mental health services.

**CRIMINAL HISTORY/REVIEW OF LIFE CRIME:** Mr. Totten does not have a prior criminal record. The index offense is his only conviction.

The index offense is described in detail in the POR. Briefly stated, Mr. Totten shot his estranged wife, Janet Totten, in the head with a rifle. The offense occurred in front of the Kaiser Permanente Medical Center, where the victim was receiving prenatal care. Witnesses saw Mr. Totten pursuing the victim on foot and then firing one shot, striking her in the head and knocking her to the ground. He then fled from the area. The victim was interviewed at Hoag Hospital where she told authorities that her husband approached

her, holding a white box that he alleged was a present for their 5-year-old daughter. She told officers that she had previously obtained a temporary restraining order against him related to problems concerning child visitation. He requested that she give him a ride to where his car was parked and they started arguing about their relationship in her car. He then retrieved a rifle from the white box and they struggled over the weapon, which discharged twice in the car, striking Mr. Totten in his leg. Mrs. Totten then ran from the car with her husband chasing her and yelling that he was going to kill her. She later told the authorities that her husband had threatened to kill her one week earlier, but she did not consider the threat serious. She reported that there had been other threats and episodes of violence in their relationship. Mrs. Totten suffered loss of hearing in her left ear and a broken jaw.

In the present interview, Mr. Totten stated that he was distraught over not being allowed to see his children and he had recently purchased a rifle at K-Mart. He reported that his wife was unaware that he was emotionally unstable and feeling suicidal. He contended that when he confronted his wife in the car outside the Kaiser Medical Center, he handed her the gun and said, "Why don't you shoot me if I can't see the kids." He then shot himself in the leg and chased after his wife and shot her. He was unable to explain why he chased after his wife and shot her, but he contended that his use of methamphetamine and his distraught emotional state were contributing factors.

**RISK FOR VIOLENCE:** The current research supports that empirically based risk assessment procedures are the most accurate and valid method for estimating future risk for violence in the community. In the present evaluation, three different psychological instruments were employed to assist in assessing future risk for violence in the community.

On the Hare Scale (PCL-R), a measure of static risk factors associated with risk for violence, Mr. Totten scored within the low range of severity. This score indicates that he does not have an antisocial orientation, and psychopathy is not a risk factor. Since this measure is based on static factors, the categorical score is not likely to change over time.

On the History Clinical Risk-20 (HCR-20), which also includes dynamic risk factors, Mr. Totten scored within the low-to-moderate range of severity. As mentioned above, he started to manifest adjustment problems in later adulthood, including occasional employment problems, relationship difficulties and a serious substance abuse problem. At present, he does not seem to have any mental difficulties, his substance use problem seems to be adequately contained, and he appears to have a viable parole plan.

On the Violence Risk Appraisal Guide (VRAG), an actuarial method, Mr. Totten also scored within the low-to-moderate range.

**CONCLUSION:** Overall, Mr. Totten appears to fall into a category that represents a low-to-moderate risk for violence in the community. His risk for violence seems to be steadily diminishing over time. On 7-23-99, Dr. Bradley estimated his risk for violence as being less than the average inmate, but average to above average for the community

population due to his problems with impulse control when experiencing emotional turmoil. Before the index offense, he was experiencing very stressful life events. He started having an extramarital affair and he became separated from his wife who left with their children. The record indicates that Mr. Totten was upset about his wife's pregnancy with their fourth child, and he had told her he wanted her to get an abortion. He started abusing methamphetamine more heavily, and his emotional state deteriorated, with Mr. Totten becoming seriously depressed and suicidal. He then exercised very poor judgment, purchasing a firearm and bringing it with him when he decided to confront his wife. The index offense appears to have been a crime of affective violence, with Mr. Totten acting spontaneously in the midst of a heated marital conflict.

Mr. Totten does not seem to be an individual who is normally prone to violence and he is not criminally oriented. The commitment offense is his only conviction, and there is no documentation of violent behavior, or other major adjustment problems, while he has been in prison. To prepare himself for parole, he should complete his vocational training in landscape, and he could benefit from educational upgrading. He also needs to be in an ongoing recovery program.

*Erich Rueschenberg*

_____
Erich Rueschenberg, Ph.D.
Forensic Psychologist
Lifer Program/Forensic Services Unit
Health Care Services Division
California Department of Corrections

July 17, 2002
Date

# EXHIBIT    "6"

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING #2
JANUARY 2004

TOTTEN, ANTHONY                                             H21049

# ADDENDUM

On 3/23/2004, I issued Inmate Totten a copy of his Board Report for his scheduled BPT hearing calendar January 2004. Inmate Totten indicated he disagreed with his report in the following area:

    I.      COMMITMENT FACTORS

        A. <u>Life Crime:</u>  PC 664/187 Pre-Meditated Attempted Murder, Count 1, one enhancement of PC 12022.5. Use of firearm "stayed", one enhancement of PC 12022.7 Inflicted Great Bodily Injury with three (3) years added to sentence, Orange County #C82571, Victim: Janet Totten, age: 29 years old. Received by CDC: 01/13/92. Sentenced: <u>17 years to Life plus 3 years enhancement.</u> MEPD: 06/29/00. Life Term starts: 06/29/93.

In preparation of this addendum, Totten was given the opportunity to review his Central File per a CDC 128B dated 04/01/04. Having reviewed the Central File, and noting Judgment of Commitment, this addendum amends and corrects the heading that <u>shoul read:</u>

    I.      COMMITMENT FACTORS:

        A. <u>Life Crime :</u>  PC 664/187 Pre-Meditated Attempted Murder, Count 1, one enhancement of PC 12022.5. Use of firearm "stayed", one enhancement of PC 12022.7 Inflicted Great Bodily Injury with three (3) years added to sentence, Orange County #C82571, Victim: Janet Totten, age: 29 years old. Received by CDC: 01/13/92. Sentenced: <u>Life plus 3 years enhancement,</u> MEPD: 06/29/00. Life Term starts: 06/29/93.

In addition, Inmate Totten wants the Board of Prison Terms to take into account, an additional job reference from the Christopher Scott Totten Construction, located at 1537 West Mckinley #10, Azusa, CA 91702. Telephone: 626-969-4999. Totten indicates that he would be offered a position as a general contractor - tile setter. He also provided an additional letter of support from a family friend who would sponsor him in the program of Alcoholics Anonymous in the county of his last county of residence. Contact person: Mary-Ellen West, located at 32472 Fathom Court, San Juan Capistrano, CA 92675. Telephone: 949-489-1835.

_H. Staten_          4-18-07
H. Staten           Date
Correctional Counselor I

                   4-20-04
R. Leach           Date
Correctional Counselor II

                   4-20-04
R. Pope           Date
Facility Captain

                   4-21-04
D. Levorse         Date
C&PR



LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING #2
JANUARY 2004 CALENDAR



**TOTTEN, ANTHONY LEE**                                                  **H-21049**

I.    **COMMITMENT FACTORS:**

    A.    **Life Crime:** PC 664/187 Pre-Meditated Attempted Murder, Count 1, One enhancement of PC 12022.5. Use of firearm "stayed" one enhancement of PC 12022.7 Inflicted Great Bodily Injury with three (3) years added to sentence, Orange County, Case #C-82571, Victim: Janet Totten, age: 29 years old. Received by CDC: 1/13/92. Sentenced: ~~17 years to~~ Life plus 3 years enhancement; MEPD: 06/29/00. Life Term starts: 6/29/93.

        1.    **Summary of Crime:** According to records of the Huntington Beach Police Department, on October 30, 1990, at approximately 10:32 a.m., a confrontation took place in front of the Kaiser Medical Facility at 18081 Beach Boulevard, between Anthony Totten and the victim, Janet Totten. Following her obstetric appointment, the victim was opening her car door, she became aware of Totten standing behind her. He was holding a long white box, which he said contained a doll swing for their daughter's birthday. The victim agreed to allow Totten to enter her vehicle and put the box in her back set. After they spoke for a while, Totten told the victim he was working behind the Kaiser facility and asked her for a ride back. He was dressed for work and appeared calm, so she agreed. When the victim started the car and looked toward Totten, she saw he was holding a rifle between the seats, which he had taken out of the white box. She began screaming and pushing the barrel down. At some point, two shots were fired inside the vehicle with one round striking Totten in leg. As the victim tried to get out of the car, Totten grabbed her arm and hit her head. When she broke free, crying and screaming, she ran toward the medical building. Totten chased her and cut her off. She ran around him and heard the gun cock and a shell eject. She fell to the ground, and was hit in the head. While the victim was on the ground, face down, Totten walked up to her and nudged her body with his foot. He then fled on foot from the location. As a result of the injuries, the victim lost the hearing in one ear and suffered a broken jaw which had to remain wired for one and one-half months. [Source document: POR, and Fourth appellate District Court of Appeal Remittitur.]

LIFE PRISONER EVALUATION REPORT                                                2
SUBSEQUENT PAROLE CONSIDERATION HEARING #2
JANUARY 2004 CALENDAR

2.    **Prisoner's Version:**  In an interview for this report, Totten states that his
      version remains the same as stated in the POR, pages 12 and 13.

⟨2⟩

"Janet and I had been separated off and on since February of 1990. In July
1990, I went into U.C.I. Medical Center for depression. I felt abandoned
by everyone. My feelings were confused at that time, about all phases of
my life. I felt I couldn't make a decision on anything. My fear while I was
at U.C.I. was that later my wife would use my hospitalization against me.
Janet was unwilling to take part in my recovery, but wanted to continue
our relationship. In August, Janet moved in with me at Executive Suites
Motel for six weeks. Then I found out that Janet was four months
pregnant. I felt a termination of the pregnancy would be best, she would
not hear of it. Janet knew I was seeing someone off and on for the past
one and a half years prior to this. In October, I had made the decision to
file for divorce. The 25th and 26th of October, we went into mediation,
and Janet checked every box on the sheet of paper and told them about my
hospitalization. They set up monitored visitation with my children. I was
seeing my children on Tuesdays and Thursdays for approximately six
months. I felt monitored visitation was Janet's way of getting back at me
for filing for divorce and because she did not want me to take the children
around my girlfriend. Saturday the 27th, Janet called my mom and told
her I could see my kids Sunday without being monitored. She said it was
all right if I took them to the park. The order states I could see my kids
from 9:00 to 5:00, I only got to see them from 10:00 until 3:00. I hadn't
done anything to my children to be treated this way. Tuesday, the 30th of
October, I knew Janet had a doctor's appointment at Kaiser, because I had
been to her previous appointments with her. I went to talk to her about the
monitored visitations. When I told her I had a gun, she started leaning on
the horn. I grabbed her arm, she reached over the seat and grabbed the gun
and fired two shots, which hit me in the leg. Janet got out of the car and
ran. I followed behind her and the gun went off. I ran and threw the gun
in the trash, I was scared and confused. I went to the shopping center
where I called my girlfriend. I called my attorney and turned myself in the
next day. If I could take back that day I would. My intent was not to
harm Janet. I feel bad for what happened." Refer to a letter of remorse
dated 10/10/03 from Totten located in the miscellaneous section of the
Central File.

3.    **Aggravating/Mitigating Circumstances:**

a.    **Aggravating Factors:**

      •   The victim was particularly vulnerable due to the prisoner's
          predatory actions.

LIFE PRISONER EVALUA     REPORT                                                    3
SUBSEQUENT PAROLE C     SIDERATION HEARING #2
. JANUARY 2004 CALENDAR



- The prisoner had a special relationship with the victim due to being the husband. He brought a rifle to the scene of the offense in a disguised box, misrepresented as a "present" in order to get into the victim's presence.

- During the commission of the crime, the prisoner had a clear opportunity to cease but instead continued.

- The manner in which the crime was committed created a potential for serious injury to persons other than the victim of the crime.

    **b.**   <u>Mitigating Factors</u>: None.

**B.**   <u>Multiple Crime(s)</u>: N/A.


## II.   <u>PRECONVICTION FACTORS</u>:

**A.**   <u>Juvenile Record</u>: None.

**B.**   <u>Adult Convictions and Arrests:</u>: The instant offense is the only recorded conviction.

**C.**   <u>Personal Factors</u>: Totten is the second of two children born to the union of his parents, Gary and Gana Zinn. His natural parents were divorced in 1959, and that same year, Totten's mother married Jason Totten. Totten and his older sister were adopted by Mr. Totten. He stated he did not find out about the adoption until he was 14 years of age and he acknowledges he had difficulty adjusting to that information. He stated that his mother subsequently had a son and daughter born to her second marriage. He referred to his family life as having consisted of a great deal of dissension and he characterized his family as having been dysfunctional. Totten had trouble understanding what was expected of him by his stepfather. He had trouble reading, which ultimately contributed to him being scared and intimidated during his first two weeks in the first grade. He felt that he ultimately adjusted to school and he became involved in extra-curricular athletics. His adoptive father "drank a lot" and was not always consistent in his child-rearing practices. Totten felt his adoptive father expected a great deal out of him and that he did not always live up to those expectations. He indicated that he had only seen his natural father approximately five times, and could not understand his behavior towards him. Totten said that his mother was "the glue that held things together" and that, while she would occasionally "yell and throw things", particularly as connected to her husband's drinking, she was considered "the peace

LIFE PRISONER EVALUATION REPORT                                                    **4**
SUBSEQUENT PAROLE CONSIDERATION HEARING #2
JANUARY 2004 CALENDAR




maker." Totten attended high school through the 11th grade, and then dropped
out. He earned a living through his adult life as a Tile Setter. He reports he has
primarily been employed as a tile setter during his adult years earning
approximately $2,800.00. Totten and his first wife Janet, the victim of case,
divorced in 1990. He indicated they had an acceptable relationship for
approximately three years, but then began "drifting apart." He acknowledges
paternity of three children born to their union. Totten was renting a room from
his parents in Laguna Hills. He claimed to have debts totaling over $55,000.00.
He was never in the military. He claimed to have no history of illicit drug use, but
did claim to have ingested Methamphetamine in the days surrounding his instant
offense.

## III.    POSTCONVICTION FACTORS:

**A.    Special Programming/Accommodations:** None.

**B.    Custody History:** Totten was received at RCC-CIM on 1/13/92 and endorsed to
Calipatria-IV on 2/20/92. He received his Initial Review on 3/12/92, U.C.C.
elected to assign Medium A custody and placed the inmate on the Support
Services and Academic Education waiting lists. On 3/12/92, the inmate was
assigned to the Education ABE-III program. On 9/11/92, inmate had an Initial
Review due to a transfer to the Unit 'C' Unit at Calipatria. U.C.C. elected to grant
Medium A custody and placed inmate on the support Services and Academic
(GED) waiting lists. Inmate's transfer was not adverse in nature due to OTC and
return per a CDC-128G dated 9/11/92. He was assigned to the Education AHS
Student program on 9/1/92. Inmate received his Annual Review on 12/15/92. He
received satisfactory Work Supervisor Reports as a AHS/GED student and
remained disciplinary-free during that period. Due to inmate's reduced
classification score to a Level III, U.C.C. elected to refer to the CSR
recommending CCC-III and per the inmate's request and alternate MCSP-III per
CDC-128G dated 12/15/92. On 12/30/92, the CSR endorsed inmate for CCC-III
per a CDC-128-G. A CDC-128-G dated 5/18/93 indicates that the inmate
achieved a reading score of 9.0 on the test of Adult Base Education. The
instructor requested that the inmate to be removed from Academic Education
program based on the test score. U.C.C. elected to place the inmate on the IS
waiting list, and yard crew.

While at CCC-III, inmate's job assignments consist of Dining Hall clean-up, Yard
Crew & Maintenance, Tile Setter and R & R clerk. During this duration, Totten
earned satisfactory to exceptional work grades on his Work Supervisor's Reports.
On 10/31/95, during inmate's Annual, U.C.C. elected to refer his case to the CSR
recommending to retain at CCC-III due to inmate's special skills (tile setter) per
request by the plant operations to have inmate assist them with tile repairs within

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING #2
JANUARY 2004 CALENDAR

the facility and alternate HDSP placement per a CDC-128G dated 10/31/95. On 11/20/95, the CSR retained the inmate at CCC-III due to Administrative Placement: Life/WOR per CDC-128G. The inmate was seen by the BPT on 6/20/96. The Board recommended: 1) No further vocational training necessary; 2) Needs to complete GED, at a minimum; 3) Average Work Reports must accept any job assignment made by staff; 4) Inmate must become an active member of AA/NA program and learn the 12 steps; 5) Needs an in-depth psych evaluation, once he is willing to cooperate; 6) Encouraged to continue with his clean disciplinary record. Inmate received Annual Review on 2/4/97 and U.C.C. elected to continue his present program yard crew assignment. On 2/10/98 per CDC 128-G, subject's case was reviewed in absentia by U.C.C. per his request via a CDC-128B-1 of 2/4/98 for his Annual Review. U.C.C. elected to refer to CSR recommending retain CCC-III due to inmate's family lives in Susanville and due to inmate's current job assignment as Tile Setter per the Maintenance Engineer. The CSR on 3/23/98, retains the inmate at CCC-III due to Administrative placement: Critical Work Skills per a CDC-128G. On 1/19/99, the inmate appears for Annual Review and U.C.C. elects to refer to the CSR recommending transfer to HDSP-III based on a confidential memo of 12/7/98 with an alternate of CTF-II non-adverse recommendation. Note there is no CSR 128-G noting a decision regarding 1/19/99 U.C.C. action. On 2/1/00 per 128G, the inmate was seen by U.C.C. for Annual Review, U.C.C. elected to refer to the CSR recommending a transfer to CTF-II and per inmates request with a alternate of CMC-W-II. On 2/25/00, the CSR endorses the inmate for CTF-II per a CDC-128G. The inmate received his Initial review on 3/10/00, U.C.C. elected to remove RTQ status, establish Medium A custody, place on the Support Services waiting list and release to the general population at CTF North Facility. Totten's work history consists of Vocational Landscaping and Gardening. He earned positive Education Progress Reports dated 12/30/02 and 3/31/03. He completed the Vocational Landscape Program and received seven (7) certificates of completion. He transferred to East Dorm non-adversely on 4/7/03 and was assigned to the PIA Wood Furniture Factory on 4/9/03. He is presently working in the finishing department and has earned satisfactory work grades.

C.    **Therapy and Self-Help Activities:**

4/3/02, CDC-128B - Participation in A.A. during the 1st quarter of 2002.

4/15/02, CDC-128B - Informative inmate has been on the IMPACT waiting list since 10/2001 and was expected to attend around 9/2002.

7/1/02, CDC 128B - AA Participation during the 2nd quarter of 2002.

9/30/02, CDC-128B - AA Participation during the 3rd quarter of 2202.

LIFE PRISONER EVALUAT REPORT                                                                                    6
SUBSEQUENT PAROLE CSIDERATION HEARING #2
JANUARY 2004 CALENDAR



12/30/02, CDC-128B - AA Participation during the 4th quarter of 2002.

3/31/03, CDC - 128B - AA Participation during the 1st quarter of 2003.

4/1/03, CDC - 128B - Completed the fall session of the 14 week IMPACT self-help program and received a certificate of completion dated 4/7/03.

**D.     Disciplinary History:**

**CDC-128's:**

| 08/22/95 | CCC | Unauthorized Use of Telephones. |
| 12/29/92 | CCC | Evading Attendance. |

**CDC-115's:**  None.

**E.     OTHER:**  On 1/27/03, Totten appeared before the Board of Prison Terms for his Subsequent Parole Consideration Hearing #1. The Board decision was to deny parole for 1 year and request a new psychological report prior to his next hearing. However, the Board recommended the prisoner to:  1) Remain disciplinary free; and 2) Participate in self-help and therapy programs.

## IV.     FUTURE PLANS:

**A.     Residence:**  Totten is planning on living with h is parents Robert and Gana Totten located at 31222 Via San Vicente, San Juan Capistrano, California.  Telephone: 949-240-8922.

**B.     Employment:**  He states upon his release from prison, he plans to re-enter his past union, which is the Local #11, Tile and Marble Finishers or Local #$18, Tile Setters Union.  His brother, has also secured employment doing asphalt work, which is a union job.  However, in the interim, Totten states that his parents have agreed to aid him financially.

**C.     Assessment:**  Totten has family that will provide residency, and financial support. He has union association, where he plans to reenter the tile and marble finishers local chapter or seek employment with the tile setters union.  He has a brother that will provide him with employment in the asphalt union.  However, there are no

recent letters of support regarding a job offer from an employer in the community.



## V.    USINS STATUS: N/A.


## VI.    SUMMARY:

A.    Considering the commitment offense, and prison adjustment, this writer believes that the prisoner would probably pose a low degree of threat to the public at this time, if released from prison.  This assessment of dangerousness is based on the Totten's free-disciplinary history while in a controlled setting, his excellent work history, and participation in alcohol and narcotic anonymous meetings.  During this period of time since his last Board Hearing, he completed the Vocational Landscaping and Garden Program on 1/23/03, with skills attained in Maintenance, Nursery Operations, Construction and Turf Management.  He earned eight (8) certificates of completion in Vocational Landscaping  and Gardening and he is a tile setter by trade.  He is a presently assigned to the PIA Wood Furniture Factory and has received satisfactory work grades while  assigned to the finishing shop.  He completed the Impact self-help program on 4/1/03 and has received a certificate for his  participation.  However, his Central File does not reflect any educational or vocational upgrading experience during this period.  Totten states upon his release, and plans to reenter his past union, tile and marble finisher or seek employment with the tile setters union.  Totten has a brother that will also offer employment doing asphalt work, which is also with a union.  He states that his letters of employment are forthcoming. In review of the life crime, Totten states that his motive for shooting the victim was that he was distraught with her and felt that, monitored visitation with his children was the victim's way of getting back at him for filing for divorce.  However, he expresses remorse for the victim, and her family.  He states he was feeling suicidal and wanted the victim to "feel sorry for him since he couldn't see his children".  Totten indicated that he used poor judgement by confronting the victim with a firearm and chased her down.  He states that he had no intentions of killing his ex-wife.  He states that he knew nothing about firing the rifle, however admits shooting her.  He admits that he used drugs prior to the instant offense, and realizes that his actions caused the victim to endure emotional and physical damage.  He indicates that he didn't have the tools in his past to understand and cope with his emotional programs.  He states that attending alcohol and narcotics anonymous meetings has enabled him to live according to a higher moral standard.  He continued to recognize his need to involve himself in a drug diversion program in order to obtain a sober lifestyle and succeed on parole as a low risk to society.  Finally, Totten states that while in prison, he had the opportunity to grow as a human being.  He states that he has corrected his life by removing his "defects of character" and replaced those

*(handwritten margin note: "Motive", "Remorse")*

LIFE PRISONER EVALUATION REPORT                                        8
SUBSEQUENT PAROLE CONSIDERATION HEARING #2
JANUARY 2004 CALENDAR

defects with good character traits over the years.  He asks for everyone's forgiveness and a change to be a productive member of the community and to continue to make his amends daily.

**B.**     Prior to release the prisoner could benefit from:

   1)  Remain disciplinary-free.

   2)  Participate in self-help and therapy program.

**C.**     This report is based on an interview with the prisoner on 10/21/03, lasting approximately1 hour, and a complete review of the Central file lasting 4 hours.

**D.**     Inmate Totten was afforded an opportunity to examine his Central File on 10/15/03 per a CDC 128B located in the general chrono section of the Central File.

**E.**     No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

TOTTEN, ANTHONY          H-21049                    CTF-SOLEDAD                    JAN/2004

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING #2
JANUARY 2004 CALENDAR

9

_____    1/8/04
H. Staten                        Date
Correctional Counselor I

_____    1/16/04
W. Stewart                       Date
Correctional Counselor II

_____    1-16-04
P. G. Dennis                     Date
Facility Captain

_____    CPR 1-20-04
D. S. Levorse                    Date
Classification and Parole Representative

TOTTEN, ANTHONY          H-21049          CTF-SOLEDAD          JAN/2004

PROOF OF SERVICE


I, Anthony Totten, on this 14th day of March, 2007, did place in the United States mail the original of my writ of habeas corpus to the Superior Court of California, County of Orange.

Pursuant to Penal Code § 1475, upon issuance of an order to show cause, the respondent must be served "at least 24 hours before the time at which the writ is made returnable," I will immediately serve the Attorney General at 110 W. "A" Street, #1100, San Diego, CA 92101, or at an address directed by the Court, and send a proof of service to the Court.  I, Anthony Totten, so state under penalty of perjury on this 14th day of March, 2007, at Soledad, California.


_____
Anthony Totten
Petitioner in pro per