# EXHIBIT C
# part 1 of 2

# CALIFORNIA APPELLATE COURTS

Case Information



| Welcome | **4th Appellate District Division 3** | Change court |
|---------|---------------------------------------|--------------|
| Search | Court data last updated: 07/23/2008 02:05 PM | |
| E-mail | **Case Summary  Docket  Scheduled Actions  Briefs** | |
| Calendar | **Disposition  Parties and Attorneys  Trial Court** | |
| Help | | |
| Opinions | | |

C|C
home

## Docket (Register of Actions)

**Totten v. The Superior Court of California, County of Orange et al.**
**Case Number G038879**

| Date | Description | Notes |
|------|-------------|-------|
| 07/02/2007 | Petition for a writ of habeas corpus filed. | by Anthony Totten |
| 07/12/2007 | Order denying petition filed. | The petition for a writ of habeas corpus is DENIED. Rylaarsdam, Acting P.J., O'Leary, J., and Ikola, J. |
| 07/12/2007 | Case complete. | |
| 07/20/2007 | Service copy of petition for review received. | by petitioner Anthony Totten |
| 09/20/2007 | Record transmitted to Supreme Court. | sent on 07/30/07 1-writ envelope w/1 loose paper, 1- writ pet for review, 1-writ habeas corpus |
| 09/27/2007 | Ext. by Supreme Court re: petition for hearing filed: | The time for granting or denying review in the above-entitled matter is hereby extended to and including 10/22/07, or the date upon which review is either granted or denied. Filed 9/13/07 |
| 10/02/2007 | Record returned from Supreme Court. | sent on 07/30/07 1-writ envelope w/1 loose paper, 1- writ pet for review, 1-writ habeas corpus |
| 10/17/2007 | Petition for review denied in Supreme Court. | denied 9/25/07 |
| 07/17/2008 | Record shipped to records center | List #79 442917088 |

**Click here** to request automatic e-mail notifications about this case.

©2007 Judicial Council of California

Name **Anthony Totten**

Address **Corrrectional Training Facility**

**P.O. Box 689**

**Soledad CA 93960**

CDC or ID Number **H-21049**

REC'D CLS DOCKETING

MC-275

GLORIA

## APPELLATE COURT OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

(Court)

**ANTHONY TOTTEN,**
Petitioner

vs.

**BEN CURREY (Warden),**
Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. _____

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

- [ ] A conviction
- [ ] Parole
- [ ] A sentence
- [ ] Credits
- [ ] Jail or prison conditions
- [ ] Prison discipline
- [X] Other *(specify)*: __Parole suitability hearing__

1. Your name: __Anthony Totten__

2. Where are you incarcerated? __Correctional Training Facility, Soledad, Calif.__

3. Why are you in custody? [X] Criminal Conviction  [ ] Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      __Attempted murder w/use of a firearm__

   b. Penal or other code sections: __664/187 12022.5(a)__

   c. Name and location of sentencing or committing court: __Orange County Superior Court, Santa Ana, California__

   d. Case number: __C 82571__

   e. Date convicted or committed: __12/3/1991__

   f. Date sentenced: __1/3/1992__

   g. Length of sentence: __Life w/parole in 7 years plus 3 years for GBI__

   h. When do you expect to be released? __5 years ago__

   i. Were you represented by counsel in the trial court? [ ] Yes. [ ] No. If yes, state the attorney's name and address:
      __N/A__

4. What was the LAST plea you entered? *(check one)*

   [XX] Not guilty  [ ] Guilty  [ ] Nolo Contendere  [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [XX] Jury  [ ] Judge without a jury  [ ] Submitted on transcript  [ ] Awaiting trial

6.  GROUNDS FOR RELIEF
    **Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

    **SEE APPENDIX "A" PAGE 6 FOR ANSWER TO 6**

    a.  Supporting facts:
        Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

        **SEE APPENDIX "A" PAGE 6 FOR ANSWERS TO 6(a), ET SEQ.**

    b.  Supporting cases, rules, or other authority (optional):
        *(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

        **SEE APPENDIX "B" PAGE 113 FOR ANSWERS TO 6(b)**

8. Did you appeal from the conviction, sentence, or commitment?  ☐ Yes. ☐ No.  If yes, give the following information:
   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"): **N/A**
   _____

   b. Result: _____    c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised: (1) _____

      (2) _____

      (3) _____

   f. Were you represented by counsel on appeal? ☐ Yes. ☐ No.  If yes, state the attorney's name and address, if known:
   _____

9. Did you seek review in the California Supreme Court? ☐ Yes. ☐ No.  If yes, give the following information:
   **N/A**
   a. Result: _____    b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised: (1) _____

      (2) _____

      (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
    **N/A**

11. Administrative Review:
    a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:
    **NO ADMINISTRATIVE REVIEW IS AVAILABLE FOR PAROLE DECISIONS**
    _____
    _____
    _____
    _____
    _____
    _____
    _____

    b. Did you seek the highest level of administrative review available? ☐ Yes. ☐ No.
    *Attach documents that show you have exhausted your administrative remedies.* **N/A**

MC-275 (Rev. January 1, 1999)          PETITION FOR WRIT OF HABEAS CORPUS
– 3 –

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  [X] Yes. If yes, continue with number 13.  [ ] No. If no, skip to number 15.

13. a. (1) Name of court: <u>Superior Court of California, County of Orange</u>

    (2) Nature of proceeding (for example, "habeas corpus petition"): <u>Habeas corpus</u>

    (3) Issues raised: (a) <u>Same as raised herein</u>

             (b) _____

    (4) Result (Attach order or explain why unavailable): <u>Denied (ATTACHMENT A, behind exhibits)</u>

    (5) Date of decision: <u>May 14, 2007</u>

  b. (1) Name of court: _____

    (2) Nature of proceeding: _____

    (3) Issues raised: (a) _____

             (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

  c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
    <u>Decision became final on 12/11/2006; received transcript on 1/30/2007</u>

_____

16. Are you presently represented by counsel?  [ ] Yes.  [X] No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court?  [X] Yes.  [ ] No. If yes, explain:

    <u>Federal District Court, Northern District (last parole hearing)</u>

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
    <u>This Court has original jurisdiction</u>

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date:   **June 21, 2007**

                              (SIGNATURE OF PETITIONER)

# A P P E N D I X  A

## Answers to 6, et seq.

### Claim I

PETITIONER'S RIGHT TO DUE PROCESS GUARANTEED BY THE
FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION WERE VIOLATED WHEN HE WAS FOUND
UNSUITABLE FOR PAROLE FOR THE FOURTH TIME ON IMMUTABLE
FACTORS THAT ARE NO LONGER RELIABLE EVIDENCE THAT HE IS
A CURRENT THREAT TO PUBLIC SAFETY AND NOT SUPPORTED BY
A PREPONDERANCE OF THE EVIDENCE AS ESTABLISHED IN
HAMDI V. RUMSFELD (2004) 542 U.S. 507, 124 S.Ct. 2633.

---

## Answers to 6 a - facts of the case

On December 3, 1991, Anthony Totten (hereafter Petitioner) was
convicted of one count of attempted premeditated first degree murder
in violation of Penal Code §§ 664/187,[1] with personal use of a
firearm in violation of Penal Code § 12022.5(a), and the great bodily
injury allegation within the meaning of Penal Code § 12022.7 was
found to be true.  Petitioner was sentenced to life with the
possibility of parole in seven (7) years plus three (3) years for
the great bodily injury.  The gun use enhancement was stayed.

Petitioner is not challenging his conviction, but the execution
of his sentence and reliance on immutable factors to deny parole
when he has served beyond the legislatively prescribed punishment
for the offense and has an exemplary postconviction record, with
a minimum eligible parole date of June 29, 2000 (EXHIBIT 1, HT 1).[2]

On August 2, 2006, Anthony Totten (hereafter Petitioner) was
found unsuitable for parole by the Board of Parole Hearings (hereafter

---

1. All codes and regulations are California, unless otherwise noted.

2. References to parole hearing transcript will be noted by HT followed
   by page number, e.g., (HT 1).

Board) for the FOURTH time.  Petitioner received his copy of the

parole hearing transcript on January 30, 2007.  Petitioner will not

belabor the Court with all the facts of the case, but only those

facts that relate directly to the reasons given to deny Petitioner

parole (EXHIBIT 1, HT 42-46).

Although Petitioner exercised his right not to talk about the

commitment offense, he did agree to answer questions asked by the

Board and was therefore sworn in (HT 4).

The facts of the commitment offense were read into the record

(HT 4-7).  In short, Petitioner and his wife, Janet Totten, were

having marital difficulties and Petitioner started seeing another

woman.  In July of 1990, feeling abandoned and confused, not able

to make decisions about anything and feeling suicidal, checked himself

into U.C.I. Medical Center for depression (EXHIBIT 2, p. 12, Probation

Officer's Report).  Although Mrs. Totten wanted to continue in the

relationship with Petitioner, she did not want to take part in his

recovery (Id.).  Petitioner filed for divorce.  As divorce proceedings

advanced the relationship between Mrs. Totten and Petitioner

deteriorated and became more strained, with Mrs. Totten, as is too

often the case with women in divorce proceedings, started using the

children as a weapon, restricting Petitioner's relationship with

his children.  As the strain of events began to take its toll,

Petitioner threatened Mrs. Totten, which resulted in her obtaining

a restraining order against him and further restricting contact with

his children.  Three days before the commitment offense, Petitioner

purchased a .22 caliber bolt action rifle.

The commitment offense occurred on October 30, 1991.  In short,

- 7 -

taken from this Court's order filed December 15, 2004, denying Petitioner's habeas petition at that time (EXHIBIT 3): "Petitioner entered the vehicle of the victim, who was his wife, with a rifle. She screamed, a scuffle ensued, and two shots were fired in the vehicle. She managed to escape from the car; he followed her and shot her in the back of the head." The next day, on October 31, 1991, Petitioner turned himself in to the Garden Grove Police Department.

Petitioner has "a classification score of 19 and you've never received any 115s" (HT 16). A classification score of 19 is the lowest a life prisoner can obtain, being equal to zero, and 115 is prison argot for a disciplinary report, or, CDC 115. Petitioner has participated in and completed vocational trades or maintained a prison job assignment since imprisonment with "excellent" work reports (HT 16-17). Petitioner works 40-50 a week in the Prison Industry Authority furniture factor, having the highest pay grade (HT 21).

The Board went over the latest psychological evaluation available (HT 21-26). The 2006 Board relied on the 2003 psychological evaluation prepared by Dr. Talbott (EXHIBIT 4). Dr. Talbott writes that Petitioner "had a methamphetamine problem for a few years" (HT 24), and Petitioner believes this contributed to his irrational thinking at the time of the offense (HT 12). The Board continues (Petitioner will quote directly from Dr. Talbott's evaluation): "Though he had been married for seven years, he was also having an affair with another woman, and his wife found out and sued for divorce, taking the children with her. Thus he was under considerable

stress. After having a series of anger-filled meetings with her,
he arranged to meet his wife again, this time at a hospital" (EXHIBIT
5, p. 3, emphasis added; HT 24).

Dr. Talbott continues, Petitioner "finished by saying that he
was remorseful. He had some of the right answers for my questions
and seemed to be on the road to getting his thinking straight
(HT 25). In assessment of dangerousness, it was Dr. Talbott's opinion
that Petitioner "will continue to be a low risk for violence within
the prison setting. At this time, however, it seems less clear that
he will be a low risk in the free community. (This based on) "his
still seemingly self-centered view of his actions suggests that his
interpersonal maturity is somewhat limited" (EXHIBIT 4, p. 4;
HT 25). Dr. Talbott's evaluation was three (3) years old.

Related evidence in Petitioner's file before the Board, was
Petitioner's 2002 psychological evaluation prepared by Dr.
Rueschenberg, Forensic Psychologist (EXHIBIT 5). After taking several
risk factors into consideration, including "imperically based risk
assessment procedures (which) are the most accurate and valid method
for estimating future risk for violence in the community" (EXHIBIT
5, p. 5), it was Dr. Rueschenberg's opinion that Petitioner is "a
low-to-moderate risk for violence in the community...steadily
diminishing over time" (Id.). In his conclusion, it was Dr.
Rueschenberg's expert opinion (EXHIBIT 5, p. 6):

"Before the index offense, he was experiencing very stressful life
events. He started having an extramarital affair and he became
separated from his wife who left him with their children....[h]e
started abusing methamphetamine more heavily, and his emotional
state deteriorated, with Mr. Totten becoming seriously depressed
and suicidal. He then exercised very poor judgment, purchasing
a firearm and bringing it with him when he decided to confront
his wife. The index offense appears to have been a crime of

- 9 -

affective violence, with Mr. Totten acting spontaneously in the
midst of a heated marital conflict.

"Mr. Totten does not seem to be an individual who is normally prone
to violence and he is not criminally oriented.  The commitment
offense is his only conviction, and there is no documentation of
violent behavior, or other major adjustment problems, while he
has been in prison."

Moreover, Petitioner's Life Prisoner Evaluation Report prepared
by correctional experts in 2004 (EXHIBIT 6), concisely stated that
Petitioner would "pose a low degree of threat to the public at this
time, if released from prison" (EXHIBIT 6, p. 7).  The LPER further
elaborates that the motive for the offense was being distraught over
the marital turmoil.

A letter opposing parole was submitted by the Huntington Beach
Police Department (HT 27-29), and the Orange County District Attorney
opposed parole (HT 32-36), both opposing parole on immutable factors
of the offense, and the deputy district attorney characterizing the
offense as a "planned execution" (HT 34).

In Petitioner's closing statement he expressed his remorse for
the victim and pointed out that he was out on bail during trial and
until sentencing without incident (HT 40).

### D E C I S I O N

In concluding that Petitioner is "not suitable for parole and
would pose an unreasonable risk of danger to society or a threat
to public safety if released from prison" (HT 42),  the 2006 Board
relied on: (1) the commitment offense, being "carried out in an
especially cruel and callous manner..carried out in a dispassionate
and calculated manner intended to be an execution style murder"
(HT 42), "the motive for this crime is inexplicable" (HT 45), the
Board "believes your still in denial about the causative factors

in the relationship with you and your wife (HT 46); (2) Dr. Talbott's psychological evaluation "is not totally supportive of release" (HT 44); and (3) "opposition to finding of parole suitability specifically by the district attorney of Orange County" (HT 44).

Petitioner was deferred two years for the same reasons as being found unsuitable for parole.  The 2006 Board did order a new psychological evaluation for Petitioner's 2008 hearing, which should have been done prior to this hearing, which the Board normally does, postponing the hearing for a new psychological evaluation.

### C O N C L U S I O N

Based on the foregoing facts, court records in this case, and the attached memorandum of law, it is requested that the Court order the respondent to show cause why relief should not be granted and the Board's 2006 decision to deny Petitioner parole be vacated and the Board conduct a new hearing in accord with due process and any instructions given by the Court.

Date: June 21, 2007

Respectfully submitted,

Anthony Totten
Petitioner in pro per

<u>V E R I F I C A T I O N</u>

I, <u>Anthony Totten</u>, declare under penalty of perjury

that I have read the foregoing facts and hereby state them to be

true and correct, and that the exhibits attached hereto in support

of the facts are true copies of the original documents, doing so

this <u>21st</u> day of <u>June</u>, <u>2007</u> at Soledad, California.

<br>

Anthony Totten
Petitioner in pro per


<u>P R A Y E R   F O R   R E L I E F</u>

I, <u>Anthony Totten</u>, hereby state that I have no other

plain or speedy remedy save habeas corpus, and therefore pray that

this Honorable Court will:

1. Order the respondent to show cause why the writ should
not be granted;

2. Appoint counsel to protect the rights of Anthony Totten
against the weight and resources of the state;

3. Declare the rights of the parties;

4. Order discovery and/or an evidentiary hearing as needed to
further develop the facts of the case;

5. Allow counsel to orally argue the case before the Court;

6. Grant the writ of habeas corpus; and

7. Grant any other relief in the furtherance of justice.

Date: <u>June 21, 2007</u>

Respectfully submitted,

Anthony Totten
Petitioner in pro per

A P P E N D I X   B

M E M O R A N D U M   O F   L A W

Claim I

PETITIONER'S RIGHT TO DUE PROCESS GUARANTEED BY THE
FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION WERE VIOLATED WHEN HE WAS FOUND
UNSUITABLE FOR PAROLE FOR THE FOURTH TIME ON IMMUTABLE
FACTORS THAT ARE NO LONGER RELIABLE EVIDENCE THAT HE IS
A <u>CURRENT</u> THREAT TO PUBLIC SAFETY AND NOT SUPPORTED BY
A PREPONDERANCE OF THE EVIDENCE AS ESTABLISHED IN
HAMDI V. RUMSFELD (2004) 542 U.S. 507, 124 S.Ct. 2633.

---

I N T R O D U C T I O N

Petitioner Anthony Totten has been imprisoned for fourteen (14)

years on a sentence that imposes a seven (7) year minimum with a

legislatively prescribed punishment of eleven (11) years (California

Code of Regulations, Title 15, (hereafter Cal. Code Regs., tit. 15),

§ 2403(d) (prior relationship "which contributed to the motivation

for the attempted murder" and the victim "suffered major injuries").

With conduct credits, Petitioner is at the upper range if he would

have been convicted of second degree murder.  This habeas petition

is to give meaning to the legislatively prescribed punishment for

the proportionality of punishment for the commitment offense.

<u>Answers to 6 b - supporting cases and authorities</u>

A.   <u>The United States Supreme Court has Held that the Standard
     of Proof at the Executive Level in Administrative Hearings
     is A Preponderance of the Evidence and Judicial Review
     is thereafter Some Evidence.</u>

Recently, the Supreme Court opined in <u>Carey v. Musladin</u> (2006)

549 U.S. ___, 2006 DJDAR 16061, 16064 (DJDAR 12/12/06), plurality

opinion, internal citations omitted:

"Virtually every one of the Court's opinions announcing a new application of
a constitutional principle contains some explanatory language that is intended

to provide guidance to lawyers and judges in future cases. It is quite wrong to invite state court judges to discount the importance of such guidance on the ground that it may not have been strictly necessary as an explanation of the Court's specific holding in the case. 'As a general rule, the principle of stare decisis directs us to adhere not only to the holdings of our prior cases, but also their explanations and the governing rules of law'; 'Although technically dicta, ... an important part of the Court's rationale for the result that it reache[s] is entitled to greater weight...'."

Thus, the principles and instructive language of United States Supreme Court decisions is controlling.

In 1985, in an ambiguous decision, the United States Supreme Court first applied the "some evidence" standard to prison disciplinary hearings (Superintendent v. Hill (hereafter Hill) (1985) 472 U.S. 445). The High Court held that all "prison administrators" needed for a determination of guilt was "some evidence." In 1988 the California Supreme Court adopted the "some evidence" as a standard of proof in the context of parole rescission hearings (In re Powell (1988) 45 Cal.3d 894, 904 [the due process clause is satisfied as long as there was "some basis in fact" and "some evidence" to support the Board's findings]). Thereafter the Board took that to mean decisions to deny parole only need be supported by "some evidence," some evidence being the standard of proof. In 2002 the California Supreme Court gave "some evidence" as a standard of proof in parole suitability decisions a life of its own by holding that all the Executive (Board or Governor) needs to support a decision to deny parole is "some evidence" (In re Rosenkrantz (2002) 29 Cal.4th 616, 655-661). Thus, not only was judicial review conducted under the "some evidence" standard, but all the Executive decision needed as a standard of proof was a mere "some evidence."

Petitioner asks, logically: If the standard of proof is "some evidence," and the standard of judicial review is "some evidence,"

how then does the "some evidence" standard apply itself?

Hill, supra, 472 U.S. 445, was ambiguous as to when the "some evidence" standard applied -- at the administrative decision level, or upon judicial review?  That ambiguity was clarified in the recent decision of Hamdi v. Rumsfeld (2004) 542 U.S. 507, 124 S.Ct. 2633, 2651, the High Court holding that the "'[some evidence]' standard therefore is ill suited to the situation in which a habeas petitioner has received no prior proceedings before any tribunal and had no prior opportunity to rebut the Executive's factual assertions before a neutral decisionmaker."  The Executive is not a "neutral decisionmaker" (In re Dannenberg (2005) 34 Cal.4th 1061, 1105, dissenting opinion [the Executive has "little to gain and potentially much to lose by granting parole, and accordingly, the incentive to give only pro forma consideration to the parole decision is strong"]).

Hamdi v. Rumsfeld, supra, 542 U.S. 507, 124 S.Ct. 2633, is United States Supreme Court precedent clearing up the ambiguity in Hill that the standard of proof at the Executive level is "a preponderance of the evidence" and judicial review is then "some evidence," thus it is the law of the land (Yarborough v. Alvarado (2004) 541 U.S. 652, 664 [AEDPA does not require that state and federal courts to wait for nearly identical factual case before a legal rule must be applied]), nullifying In re Rosenkrantz, supra, 29 Cal.4th 616, on the holding of "some evidence" as a standard of proof.

Moreover, although a parole suitability hearing is actually a sentencing hearing (In re Roberts, 36 Cal.4th 575, 586, 587-590 (2005)), transferring the formal pronouncement of the sentence from a court to an Executive agency, "the existence of this power does

not imply a further power in the state to immunize its acts, through an administrative agency, from the strictures of the Fourteenth Amendment" (<u>Sturm v. California Adult Authority</u> (9th Cir. 1967) 395 F.2d 446, 449, Browning J. concurring). The Board being bound by United States Supreme Court precedent, Petitioner had a constitutional guarantee to have his parole suitability determined by "a preponderance of the evidence" standard of proof, not a mere "modicum of evidence," violating his right to due process.

If international terrorists who are enemy combatants of the United States are entitled to "a preponderance of the evidence" as the standard of proof at the administrative level of an Executive decision, are not state prisoners who not only have an expectation of parole but are eligible for parole, entitled to at least the same?

Whether by a preponderance of the evidence or some evidence, the findings by the Board are not supported by the evidence that Petitioner is a <u>current</u> threat to the public.

B. <u>Petitioner has Satisfied the Legislatively Prescribed Punishment for His Commitment Offense and the Commitment Offense is Therefore No Longer Reliable Evidence of Petitioner's CURRENT Threat to Public Safety.</u>

It was recently decided in the recent precedent setting case of <u>In re Lee</u> (2006) 143 Cal.App.4th, 49 Cal.Rptr.3d 931, 936 [petition for review denied, request for depublication denied 2/7/07]:

> "The test is not whether some evidence supports the <u>reasons</u> the Governor cites for denying parole, but whether some evidence indicates a parolee's release <u>unreasonably endangers public safety.</u> (Cal. Code Regs. tit. 15, § 2402, subd. (a) [parole denied if prisoner 'will pose an unreasonable risk or danger to society if released from prison'], see e.g. <u>In re Scott</u> (2005) 133 Cal.App.4th 573, 595 ['The commitment offense can negate suitability [for parole] only if circumstances of the crime...rationally indicate that the offender will present an unreasonable public safety risk if released from prison'], but see <u>In re Lowe</u> (2005) 130 Cal.App.4th 1405 [suggested 'some evidence' applies to the factors, not dangerousness].) Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." (Emphasis in original.)

The Lee court continued at 939: "Lee's crimes have little, if any
predictive value for future criminality.  Simply from the passing
of time, Lee's crimes almost 20 years ago have lost much of their
usefulness in foreseeing the likelihood of future offenses than if
he committed them five or ten years ago. (In re Scott, [2005], 133
Cal.App.4th 573, 595 [past crime's value for predicting future crime
diminishes over time]").

Petitioner was sentenced to life with the possibility of parole
in seven years (Penal Code § 3046(a)(1)).  To cure the mischief of
abuse of discretion and disparate punishment for similar crimes
committed under similar circumstances under the indeterminate
sentencing law, Penal Code § 3041 was amended on July 1, 1977,
repealing the indeterminate sentencing law and implementing the
Uniform Determinate Sentencing Act of 1976 (UDSA).  Penal Code §
3041(b) mandated that a release date be set one year prior to the
minimum term, unless the Board determines that "the timing and gravity
of the current convicted offense...is such that consideration of
the public safety requires a more lengthy period of incarceration...."
Penal Code § 3041(a) mandates "[t]he release date shall be set in
a manner that will provide uniform terms for offenses of similar
gravity and magnitude in respect to their threat to the public."
In compliance with this legislative mandate, the parole authority
promulgated guidelines in the Cal. Code of Regs., tit. 15, § 2400,
et seq.  Most relevant: "A parole date set under this article shall
be set in a manner that provides uniform terms for offenses of similar
gravity and magnitude with respect to their threat to the public"
(Cal. Code Regs., tit. 15, § 2401).

Taking the facts and circumstances of various life offenses into consideration, and different common manners in executing the offenses in gravity and magnitude, uniformity, and threat to public safety, the Board implemented Cal. Code Regs., tit. 15, § 2403(b-f). "With respect to persons sentenced to indeterminate terms, the purpose of punishment is satisfied by the requirement of service of a minimum term before eligibility for parole" (In re Morrall (2002) 102 Cal.App.4th 280, 292). When penal statutes have various indeterminate sentences of 7 years to life, 15 years to life, 20 years to life, and 25 years to life, the minimum fixed years has to mean something as does the corresponding legislatively prescribed matrices, otherwise all indeterminate sentences could simply be 1 year to life and the Board arbitrarily decide how much punishment is enough punishment, which is exactly the mischief the an indeterminate sentence under the Uniform Determinate Sentencing Act was to cure. It appears, however, the old adage "the more things change the more they remain the same" has never been more true as it is with the arbitrariness of the Board today in the politically driven arena of parole. The legislatively prescribed punishment for the gravity and magnitude of Petitioner's offense is 111 years (Cal. Code Regs., tit. 15, §. 2403(d)(II-C) [the victim was Petitioner's wife who contributed to the motive and her injuries were major]). That has to mean something. To be found suitable years after the uniform term, then the term fixed in accord to that term, is absolutely meaningless and nothing short of a legal fiction, a mere illusion of proportionality and uniformity.

While the commitment offense may "initially" justify a denial

of parole continued use of the offense when the prisoner has demonstrated exemplary postconviction behavior may violate due process (Biggs v. Terhune (9th Cir.2003) 334 F.3d 910, 916; Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063, 1081; In re Scott II (2005) 133 Cal.App.4th 573, 595; In re Shaputis (2005) 135 Cal.App.4th 217, 231; and the precedent setting case of In re Lee, supra, 49 Cal.Rptr.3d, at 940 ["First, the board and Governor must focus their parole decisions on whether a prisoner continues to pose an unreasonable risk to public safety." (and at 941) "To deny parole, the reason must relate to a defendant's continued risk to public safety"]).

When a prisoner, however, has exceeded the matrix for his or her commitment offense, as Petitioner, then punishment for the offense has been satisfied and parole consideration must be on other factors, such as postconviction behavior.  This is in complete accord with the offense not being viewed in a vacuum as though it is current, but is to be placed into perspective relative to time, "entailing primarily what a man is and what he may become rather then simply what he has done" (Greenholtz v. Inmates of Nebraska Penal Complex (1979) 442 U.S. 1, 10).  See also Biggs v. Terhune, supra, 334 F.3d, at 915; Irons v. Carey (9th Cir. 2007)___ F.3d___, slip opinion, p. 2469 (3/6/2007); Sanchez v. Kane (N.D. Cal. 2006) 444 F.Supp.2d 1049, 1062; Rosenkrantz v. Marshall, supra, 444 F.Supp.2d 1063, 1084-1086; Martin v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1038, 1047).  The distinction made by the Ninth Circuit in Irons, "[s]pecifically, in Biggs, Sass, and here, the petitioner had not served the minimum number of years to which they had been sentenced

at the time of the challenged parole denial by the Board. <u>Biggs</u>,
334 F.3d at 912; <u>Sass</u>, 462 F.3d at 11125" (<u>Irons v. Carey</u>, <u>supra</u>,
slip opinion, p. 2481). <u>Irons</u> is instructive (<u>Id</u>., at 2482).

Unlike <u>Sass</u> who had seven prior drunk driving convictions that
went unpunished and a drunk driving related second degree murder;
thus, "the gravity of his convicted offense in combination with his
prior offenses" (<u>Sass v. California Board of Prison Terms</u> (9th Cir.
2006) 461 F.3d 11123, 11129), and <u>Irons</u>, after an argument retrieved
a gun and after shooting his victim 12 times, stabbed his when he
complained of being in pain, then wrapping him in a sleeping bag
then disposing of the body in the bay after 10 days (<u>Irons v. Carey</u>,
<u>supra</u>, slip opinion, p. 2473), this was Petitioner's only offense
and after a single shot fled the scene.

In Petitioner's case, the offense being domestic in nature,
situational and an aberration in his life, 15 years after the
commitment offense, six (6) years beyond the minimum term, the minimum
term having been satisfied in 2001, Petitioner therefore exceeding
the legislitively prescribed punishment for his offense, there is
no evidence Petitioner is a <u>current</u> threat to public safety, the
commitment offense no longer having an "indicia of reliability" (<u>Biggs
v. Terhune</u>, <u>supra</u>, 334 F.3d, at 915). The continued reliance on
the offense to deny Petitioner parole violates his right to due
process.

///////
///////
///////
///////

- 20 -

C.  <u>The Factors of the Commitment Offense Are Not Supported by</u>
    <u>the Evidence</u>.

        In finding Petitioner unsuitable based on the commitment offense,
the Board found the offense was "carried out in an especially cruel
and callous manner...dispassionate and calculated manner intended
to be an execution style murder" (HT 42) and "the motive for this
crime is inexplicable" (HT 45).

        Firstly, finding the motive for the offense to be "inexplicable"
clearly demonstrates how disingenuous the Board is.  The motive for
this offense, divorce proceedings, jealousy, the wife using the
children as a weapon, anger, resulting in extreme stress are such
common occurrences in today's society that the mixture has become
a sad, but very real motive for spousal murder that "[e]ven law
abiding citizens can understand this motive" (<u>In re Fuentes</u> (2005)
135 Cal.App.4th 152, 37 Cal.Rptr.3d 426, 433).  The forensic experts
who evaluated Petitioner understood the motive (EXHIBIT 5, p. 4),
and the correctional experts understood the motive (EXHIBIT 6, p.
7), so how is it that parole commissioners who are supposed to be
trained in determining parole suitability are unable to understand
it?  Moreover, simply: "An 'inexplicable' motive, as we understand
it, is one that is unexplained or unintelligible, as where the
commitment offense does not appear to be related to the conduct of
the victim and has no other discernible purpose" (<u>In re Scott I</u> (2004)
119 Cal.App.4th 871, 893; <u>Rosenkrantz v. Marshall</u>, <u>supra</u>, 444
F.Supp.2d, at 1082).

        Secondly, the offense was not "carried out in an especially
cruel and callous manner...dispassionate and calculated manner
intended to be an execution style murder" (HT 42).  To make this

finding, the Board would have to prove that the victim was made to suffer in some exceptional way (<u>In re Scott I</u>, <u>supra</u>, 119 Cal.App.4th, at 892; <u>In re Smith</u> (2003) 114 Cal.App.4th 343, 366-367; <u>Rosenkrantz v. Marshall</u>, <u>supra</u>, 444 F.Supp.2d, at 1082-1083). Moreover, there is zero evidence that Petitioner intended to murder his wife "execution-style." Any such finding is pure speculation. The only item Petitioner had on him at the time of the offense was the rifle, no handcuffs, no duct tape, no rope, no blindfold, absolutely nothing that would indicate that he planned to murder his wife "execution style." No doubt the Deputy District Attorney's argument to the Board, characterizing the offense as a "planned execution" (HT 40) influenced this finding by the Board.

Most importantly, the Board must provide Petitioner "an individualized consideration of the specified criteria and cannot be arbitrary or capricious" (<u>In re Rosenkrantz</u>, <u>supra</u>, 29 Cal.4th, at 677); and "[a]ll relevant, reliable information available to the panel shall be considered in determining suitability for parole" (Cal. Code Regs., tit. 15, § 2402(b)). Petitioner's "'motivation' for the offense tends to show <u>suitability</u> when it was 'the result of significant stress in his life, especially if the stress has built up over a long period of time" (<u>Id</u>., § 2402(d)(4)). The forensic evidence before the Board, both Dr. Talbott's evaluation (EXHIBIT 5, p. 3 [Petitioner "was under considerable stress"]) and Dr. Rueschenberg (EXHIBIT 5, p. 6 [Petitioner "was experiencing very stressful life events]), and correctional experts (EXHIBIT 6, p. 7 [Petitioner was "distraught over the marital turmoil"]), are in accord, Petitioner was experiencing severe stress at the time

- 22 -

of the offense.  While the Board found the motive to be
"inexplicable," "that conclusion was not only unjustified by the
evidence but was reached without consideration of 'undisputed evidence
[Petitioner] committed his offense while under emotional stress
[which] should have been, but was not, considered in his favor.'
(Scott I, supra, 119 Cal.App.4th at p. 890, fn. 9" (In re Scott II,
supra, 133 Cal.App.4th, at 596; Rosenkrantz v. Marshall, supra, 444
F.Supp.2d, at 1082; In re Weider (2006) ___ Cal.App.4th ___, 2006
DJDAR (12/6/06) 15795, 15801 c. 2-15802 c.1 ["The regulations
requiring the Board to consider the role that such stress may have
played in the commissioner of the crime reflects the law's awareness
of human nature...it does not appear the Board considered this
evidence at all.  This it is bound to do"]).  See also In re Scott
II, supra, 133 Cal.App.4th, at 596; In re Lee, supra, 49 Cal.Rptr.3d,
at 939).

Petitioner was denied his right to due process in that the Board
failed to consider the material evidence that Petitioner was under
considerable stress when he committed the offense, resulting in an
arbitrary decision.

D.  **Psychiatric Evaluations Relating to Predicting Dangerousness
    are not Reliable Evidence of Current or Future Dangerousness.**

In finding Petitioner unsuitable for parole, the Board relied
on Dr. Talbott's psychological evaluation as "not being totally
supportive of release" (HT 44), but never stated why it was not
supportive of release, being totally conclusory and unsupported by
any evidence.

Petitioner, nor the Court, should have to guess what the Board
was relying on, but for the sake of argument, let us guess the Board

was relying on Dr. Talbott's statement to the effect that Petitioner "will continue to be a low risk for violence within the prison system. At this time, however, it seems less clear that he will be a low risk in the free community. In particular, his still seemingly self-centered view of his actions suggests that his interpersonal maturity is somewhat limited" (EXHIBIT 4, p. 4). Being self-centered, even narcissistic, does not make one a threat to public safety. If that were the case many people, including doctors, preachers, lawyers and even judges should be locked up immediately. The reason Dr. Talbott writes what he does is only because Petitioner refuses to talk about the commitment offense, Dr. Talbott writing, "I had to work on getting him to talk about his thinking about how his crime affected other" (EXHIBIT 4, p. 4). This is not evidence that Petitioner is a current threat to public safety. In fact, predictions of dangerousness, or even not being dangerous, are pretty much meaningless. As opined in In re Scott II, supra, 133 Cal.App.4th, at 595 fn 9:

> "It is worth noting, as our Supreme Court (People v. Murtishaw (1981) 29 Cal.3d 733, 768 [], disapproved on other grounds in People v. Boyd (1985) 38 Cal.3d 762 []), that a large number of legal and scientific authorities believe that, even where the passage of time is not a factor and the assessment is made by an expert, predictions of future dangerousness are exceedingly unreliable. (citations to academic research.) According to a Task Force of the American Psychiatric Association, '[n]either psychiatrists nor anyone else have demonstrated an ability to predict future violence or dangerousness. (Am.Psych.Assn., Task Force Report 8, Clinical Aspect of the Violent Individual (1974) at p. 28.) As our Supreme Court has also noted, 'the same studies which proved the inaccuracy of psychiatric predictions [of dangerousness] have demonstrated beyond dispute the no less disturbing manner in which such prophecies consistently err: they predict acts of violence which will not in fact take place ('false positives'), thus branding as 'dangerous' many persons who are in reality totally heamless.[Citation.]' (People v. Burnick (1975) 14 Cal.3d 306, 327 [])."

See also In re Elkins, supra, 50 Cal.Rptr.3d, at 520, reaffirming Scott.

The only realiable predictor of future behavior is recent past behavior as it relates to preconviction behavior. Unproved hearsay allegations (EXHIBIT 2, pp. 6-8; 115-118) are not evidence, and Petitioner will not discuss nor answer any questions about the incident or the commitment offense.

Denying Petitioner parole on the factor that Dr. Talbott's evaluation wasn't "totally supportive of parole" was arbitrary, especially in light of the fact that the Board selectively ignored psychiatric evidence that Petitioner committed the offense under "considerable stress" (EXHIBIT 4, p. 3), "experiencing very stressful life events"(EXHIBIT 5. 6), when the regulations, as argued supra, provide that committing the offense under extreme stress mitigates the offense and is a factor favoring suitability for parole.

E.  The Board Has An Underground Policy to not Find Any Life Prisoner Suitable for Parole that Exercises His or Her Constitutional and Statutory Right to not Discuss the Commitment Offense.

In the Fifth Amendment guarantee for a defendant not to have to testify against himself, lies the same guarantee in Penal Code § 5011(b) ["The Board of [Parole Hearings] shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed."] This guarantee, in theory, is also found in the Board's regulations: "The board shall not require an admission of guilt to any crime for which the prisoner was committed. A prisoner may refuse to discuss the facts of the crime in which instance a decision shall be made based on the other information available and the refusal shall not be held against the prisoner" (Cal. Code Regs., tit. 115, § 2236). Moreover, "a prisoner's refusal to admit participation in the crime on matters of conflicting evidence

does not necessarily constitute unsuitability for parole" (In re Caswell (2002) 92 Cal.App.4th 1017, 1033), nor "a prisoner's 'minimization' of his involvement in the crimes is sufficient" (Id.).

Petitioner, like many similarly situated prisoners, refuses to discuss the commitment offense for the very reasons cited in In re Scott II, supra, 133 Cal.App.4th, at 601: "A parole hearing does not ordinarily provide a prisoner a very good opportunity to show his offense was not committed 'in an especially heinous, atrocious or cruel manner,' even if such evidence exists and the prisoner is willing to run the risk his effort to make such a showing will be seen as unwillingness to accept responsibility and therefore evidence of unsuitability"; see also In re Elkins, supra, 50 Cal.Rptr.3d, at 520. Petitioner accepted responsibility from the start, surrendering himself to authorities the next day. Petitioner presented his case at trial, and will not retry the case before a politically charged body that twists everything around and puts words in a prisoner's mouth. It is that simple. Any attempt to try to correct the record would only be seen as not accepting responsibility or making excuses. Thus, Petitioner accepts the facts of the offense however the Board or Court wants to interpret them.

In 2006, the year of Petitioner's parole hearing in question, to Petitioner's knowledge, the Board did not find any prisoner suitable for parole who did not discuss the commitment offense. Also, to Petitioner's knowledge, in 2003, the one year Petitioner has information for, in suitability findings that were made, .51 percent were found suitable for parole, with some Commissioners finding suitability when the offense was not discussed and others

not doing so, making the use of the statute and regulation arbitrary.
Petitioner believes, from her previous record as a Commissioner,
that Carol Bentley, who read the decision in Petitioner's case, has
never found any prisoner suitable for parole who refused to talk
about the offense, and moreover, she has never found any prisoner
suitable for parole in which a woman was the victim.

Petitioner does know this, and believes it to be true, pursuant
to "Petitioner's Brief In Support Of Habeas Corpus Relief" in Coleman
v. Board of Prison Terms, United States District Court, Eastern
District of California, Case No. CV S 96-0783 LKK PAN, in a deposition
by then Chairman Gillis, at page 99:9-112, Mr. Gillis stated that
when a prisoner invokes his right not to discuss the offense it "does
not help in the decision-making.... It does not give the panel any
insight as to the suitability and those kind of things." And, Id.
at 100:14-19, explaining burden of proving suitability is on the
prisoner, "If the inmate does not choose to accept that responsibility
to talk about remorse or the other issues that we need to discuss,
... it's the inmate that opts to do that." At Id. 102:7-15, Chairman
Gillis essentially stated that if a prisoner chooses not to discuss
the commitment offense he could not be found suitable for parole.

The only way this claim can be intelligently decided is after
an EVIDENTIARY HEARING to garner evidence and testimony of the Board's
current policy of not granting parole when a prisoner exercises his
or her right not to discuss the offense. Does the Board have an
underground policy to not grant parole when the prisoner exercises
his or her right not to discuss the offense? The record will clearly
demonstrate that Carol Bentley never grants parole when the prisoner

- 27 -

does not discuss the commitment offense, or when the victim is a woman.  Moreover, at Petitioner' second parole suitability hearing he had two male Commissioners, although finding Petitioner unsuitable for parole, deferred him only one year, while all subsequent hearings were conducted by female Commissioners, and although nothing changed accept more time between the offense and the hearings and more years of exemplary behavior, the female Commissioners after denying parole, deferred Petitioner the maximum, two years, demonstrating a bias and arbitrary application of the decision-making process.

The Board's underground policy to not grant parole when a prisoner exercises his right to not discuss the offense violated Petitioner's right to due process.

Petitioner respectfully requests an EVIDENTIARY HEARING to garner evidence of the Board's current underground policy of not granting parole when a prisoner refuses to discuss the offense, and to prove that the grant rate in 2006 of prisoners who exercised their right not to discuss the offense was virtually zero percent.

## C O N C L U S I O N

WHEREFORE, in that Petitioner has exceeded, not only his minimum term, but the legislatively prescribed punishment for the facts and circumstances of his offense, and his postconviction record is exemplary and zero evidence that he is a CURRENT threat to public safety, it is respectfully requested that the Court order the respondent to show cause why the writ should not be granted.

Date: June 21, 2007

Respectfully submitted,

Anthony Totten
Petitioner in pro per

- 28 -

# EXHIBIT   "1"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

COPY

INMATE

In the matter of the Life )
Term Parole Consideration )
Hearing of: )          CDC Number H-21049
                          )
ANTHONY TOTTEN            )
                          )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

AUGUST 3, 2006

11:22 A.M.


PANEL PRESENT:

Sandra Bryson, Presiding Commissioner
Carol Bentley, Deputy Commissioner


OTHERS PRESENT:

Anthony Totten, Inmate
Anthony Hall, Attorney for Inmate
Paul Chrisopoulos, Deputy District Attorney
CORRECTIONAL OFFICERS UNIDENTIFIED


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No      See Review of Hearing
_____ Yes     Transcript Memorandum


Kendra Rose                    House of Scribes

ii

## INDEX

|  |  | PAGE |
|---|---|---|
| Proceedings . . . . . . . . . . . . . . . . . . . . | | 1 |
| Case Factors. . . . . . . . . . . . . . . . . . . | | 4 |
| Pre-Commitment Factors. . . . . . . . . . . . . . | | 9 |
| Post-Commitment Factors . . . . . . . . . . . . . . | | 18 |
| Parole Plans. . . . . . . . . . . . . . . . . . . | | 26 |
| Closing Statements. . . . . . . . . . . . . . . . | | 33 |
| Recess. . . . . . . . . . . . . . . . . . . . . | | 42 |
| Decision. . . . . . . . . . . . . . . . . . . . | | 43 |
| Adjournment . . . . . . . . . . . . . . . . . . | | 49 |
| Transcriber Certification . . . . . . . . . . . . | | 50 |

1

1          P R O C E E D I N G S

2          PRESIDING COMMISSIONER BRYSON:  And the

3    checklist got as far as your desk.  All right.  Are we

4    on record?

5          DEPUTY COMMISSIONER BENTLEY:  Yes, we are.

6          PRESIDING COMMISSIONER BRYSON:  This is a

7    subsequent parole consideration hearing for Anthony

8    Totten, CDC number H, Henry, 21049.  The date is

9    August 3rd, 2006, and the time is 11:22.  We're

10   located at California Training Facility, Soledad.  The

11   inmate was received January 13th, 1992 from Orange

12   County.  The life term began June 29th, 1993.  The

13   minimum eligible parole date, June 29th, 2000.  Case

14   number C, Charles, 82571, count one, the controlling

15   commitment offense, Penal Code -- thank you -- 664,

16   187 attempted murder first, and Penal Code 12022.7,

17   inflicting great bodily injury for which the inmate

18   received a term of life plus three years.  This

19   hearing is being recorded.  For the purpose of voice

20   identification, each of us will state our first and

21   last names, spelling the last name.  When it is your

22   turn, sir, after you spell your last name, please

23   state your CDC number.  I will start and then go to my

24   left.  Sandra Bryson, B-R-Y-S-O-N, Commissioner, Board

25   of Parole Hearings.

26         DEPUTY COMMISSIONER BENTLEY:  Carol Bentley, B-

27   E-N-T-L-E-Y, Deputy Commissioner.

2

1          DEPUTY DISTRICT ATTORNEY CHRISOPOULOS:  Paul

2    Chrisopoulos, C-H-R-I-S-O-P-O-U-L-O-S, Deputy District

3    Attorney, County of Orange.

4          ATTORNEY HALL:  Anthony Hall, H-A-L-L, Attorney

5    for Mr. Totten.

6          INMATE TOTTEN:  Anthony Totten, T-O-T-T-E-N, H-

7    21049.

8          PRESIDING COMMISSIONER BRYSON:  I note for the

9    record, we have two correctional peace officers in the

10   room who are here for security purposes.  Commissioner

11   Bentley, is there any confidential in the file, and,

12   if so, will it be used today?

13         DEPUTY COMMISSIONER BENTLEY:  There is and we

14   won't be using it.

15         PRESIDING COMMISSIONER BRYSON:  All right.  I

16   passed the hearing checklist marked Exhibit 1 to your

17   attorney and also to the district attorney to ensure

18   we're all proceeding with the same set of documents.

19   Does the district attorney have all the documents?

20         DEPUTY DISTRICT ATTORNEY CHRISOPOULOS:  Yes, I

21   do.

22         PRESIDING COMMISSIONER BRYSON:  Thank you.

23   Counsel, do you have all the documents?

24         ATTORNEY HALL:  Yes, we do.

25         PRESIDING COMMISSIONER BRYSON:  Are there any

26   other documents to be submitted?

27         ATTORNEY HALL:  There is not at this time.

3

1          PRESIDING COMMISSIONER BRYSON:  All right.  Sir,

2    today, you and your attorney signed the document

3    marked Exhibit 2 regarding ADA accommodation, hearing

4    procedures and inmates' rights.  Do you have any

5    questions on the procedures and your rights?

6          INMATE TOTTEN:  No.

7          PRESIDING COMMISSIONER BRYSON:  All right.  Now

8    I noticed you're wearing glasses.  Are they for both

9    reading and seeing?

10          INMATE TOTTEN:  Both reading and seeing.

11          PRESIDING COMMISSIONER BRYSON:  All right.  Are

12    they the kind that dim in the light?

13          INMATE TOTTEN:  Yes.

14          PRESIDING COMMISSIONER BRYSON:  That's very

15    handy.  That works very well, doesn't it?  All right.

16    Do you have any problems hearing?

17          INMATE TOTTEN:  No.

18          PRESIDING COMMISSIONER BRYSON:  And no problems

19    walking to the hearing?  All right.  Thank you.

20    Counsel, do you have any comments or concerns

21    regarding the ADA rights or this inmate's ability to

22    participate in this hearing?

23          ATTORNEY HALL:  No, I don't.

24          PRESIDING COMMISSIONER BRYSON:  Thank you.  Are

25    there any preliminarily objections?

26          ATTORNEY HALL:  There is none.

27          PRESIDING COMMISSIONER BRYSON:  All right.  Will

4

1    the inmate be speaking to the panel today?

2        **ATTORNEY HALL:**  He will speak to the panel,

3    however, he will not be discussing the commitment

4    offense.

5        **PRESIDING COMMISSIONER BRYSON:**  All right.  But

6    if you'll speak at all, I'll need to swear you in,

7    sir.  The right hand, please, sir.  Do you solemnly

8    swear or affirm that the testimony you give at this

9    hearing will be the truth, the whole truth and nothing

10   but the truth?

11       **INMATE TOTTEN:**  Yes.

12       **PRESIDING COMMISSIONER BRYSON:**  Thank you.  All

13   right.  I will read the facts of the crime into the

14   record from the Court of Appeals, 4th Appellate

15   District, Division III, People v Anthony Lee Totten,

16   Superior Court number C 82571.  As to the facts,

17   Totten and Janet had been separated for several

18   months.  During one of their attempts to

19   reconciliation, she became pregnant with their third

20   child.  She was five months pregnant at the time of

21   the shooting.  On October 23rd, 1990, Janet called

22   Totten and asked him to baby-sit the children that

23   night while she worked late.  Upset, he came to see

24   her at work telling her he did not have money to feed

25   the children dinner.  She gave him money. Later that

26   day, Totten phoned Janet at work and an argument

27   ensued.  Janet worried about having -- leaving the

5

1   children with him.   After work, she drove to the baby-
2   sitter's house to pick them up.   Totten approached
3   waving papers in front of her saying he was going to
4   file them.   He asked for a pen.   She handed him a pen
5   and walked away.   Totten reached into Janet's car and
6   broke off the blinker knob.   When Janet drove away,
7   Totten followed.   Janet went to her mother's house
8   where she lived with the children.   She parked and
9   went inside.   Totten, who had followed in his car,
10  parked walked to her car and deflated the tire.
11  Inside, Janet called the police.   Totten followed her
12  into the house and demanded to use the phone calling
13  her names.   He said if he did not get the kids that
14  night, he would kill her.   On the following day,
15  Totten called Janet and again threatened to kill her.
16  When he pulled up in front of the house, Janet called
17  the police.   They advised her to obtain a restraining
18  order.   She initiated the proceeding the same day.   On
19  the next day, the possession was granted.   In the
20  order, Totten's visitation with the children was
21  decreased from two days per week to one, Sunday.   In
22  addition, it was provided that visitation would be
23  monitored.   Totten was upset about the order.   While
24  at court, Totten asked Janet when her next doctor's
25  appointment was scheduled, and she told him it was the
26  following Tuesday.   On Sunday, Janet dropped the kids
27  off at Totten's mother's house and arranged to pick

6

1  them up at 2:00 or 3:00 p.m. because his mother could

2  not stay until 5:00, the end of the scheduled time.

3  Totten became angry at having his visit cut short.  On

4  Tuesday, October 30th, Janet went to her scheduled

5  obstetric appointment at Kaiser Medical Center.

6  Following the visit, as she was opening her car door,

7  she came aware of Totten standing behind her.  He was

8  holding a long, white box, which he said contained a

9  doll swing for their daughter's birthday.  She agreed

10  to allow him to put it in her back seat.  After they

11  spoke for a while, Totten told Janet he was working

12  behind the Kaiser facility and asked her for a ride

13  back.  He was dressed for work and appeared calm so

14  she agreed.  When Janet started the car and looked

15  toward Totten, she saw he was holding a rifle between

16  the seats, which he had taken out of the white box.

17  Janet began screaming and pushing the barrel down.  At

18  some point, two shots were fired in the car one of

19  them hitting Totten in the leg.  As Janet tried to get

20  out of the car, Totten grabbed her arm and hit her

21  head.  When she broke free crying and screaming, she

22  ran toward the medical building.  Totten chased her

23  and cut her off.  She ran around him, and heard the

24  gun cock and a shell eject.  She then fell to the

25  ground hit in the head.  While Janet was on the ground

26  face down, Totten walked up to her and nudged her body

27  with his foot.  As a result of the injury, Janet lost

1    the hearing in one hear and suffered a broken jaw,

2    which required she have it wired for two and one-half

3    months.   This inmate has no priors in his juvenile

4    record or his adult record of arrests and convictions.

5    The incident offense being the only recorded

6    conviction.  So, sir, this is such an -- an abhorrent

7    crime based on your history, which is as of no crime,

8    that we're going to try and understand more about you,

9    and about what happened, and -- and so forth today by

10   looking at your personal history.  How would you

11   characterize your personal history?  Did you -- just

12   your general upbringing, how would you characterize

13   that?

14        INMATE TOTTEN:  It was good.

15        PRESIDING COMMISSIONER BRYSON:  It was good?

16        INMATE TOTTEN:  Yeah.  It was just like an

17   average family.

18        PRESIDING COMMISSIONER BRYSON:  It was?

19        INMATE TOTTEN:  Mm hmm.

20        PRESIDING COMMISSIONER BRYSON:  Did you graduate

21   from high school?

22        INMATE TOTTEN:  No.

23        PRESIDING COMMISSIONER BRYSON:  Why not?

24        INMATE TOTTEN:  I went in the tile business with

25   my dad when I was about 16.

26        PRESIDING COMMISSIONER BRYSON:  You got really

27   close though.  You were in the 11th grade, right?

8

1       INMATE TOTTEN:  Yeah.

2       PRESIDING COMMISSIONER BRYSON:  Whose decision

3  was it to quit school-yours or your dads?

4       INMATE TOTTEN:  Mine.  Mine.

5       PRESIDING COMMISSIONER BRYSON:  On what basis

6  did you quit -- quit school then?

7       INMATE TOTTEN:  I just got bored with it.

8       PRESIDING COMMISSIONER BRYSON:  Did you?

9       INMATE TOTTEN:  Yeah.

10      PRESIDING COMMISSIONER BRYSON:  What did your

11 parents think about that?

12      INMATE TOTTEN:  Well, they tried to get me to go

13 to school, but I just ended up going in the union --

14 joining the union, the tile setter's union.

15      PRESIDING COMMISSIONER BRYSON:  I see.  Now, you

16 said it was a good, average upbringing.  What do you

17 mean by that?  Was your --

18      INMATE TOTTEN:  It was an upper-class -- a

19 middle, upper-class family.

20      PRESIDING COMMISSIONER BRYSON:  Upper-class?  Uh

21 huh.  Uh huh.

22      INMATE TOTTEN:  Yeah.  Lived in a nice

23 neighborhood.

24      PRESIDING COMMISSIONER BRYSON:  OK.  Now,

25 according to the board report dated January of 2004,

26 you referred to your family as having consisted of a

27 great deal of dissension.  You characterized your

9

1   family as having been dysfunctional, and you had

2   trouble understanding what was expected of you by your

3   stepfather.  You had trouble reading, which

4   contributed you -- contributed to you being scared and

5   intimidating during your first two weeks in the first

6   grade, and your adopted father drank a lot.  Is --

7   now, that --

8           INMATE TOTTEN:  Yeah.  That -- that kind of --

9           PRESIDING COMMISSIONER BRYSON:  -- that's an odd

10  --

11          INMATE TOTTEN:  -- you know, as we got older,

12  that kind of, you know, things got better.

13          PRESIDING COMMISSIONER BRYSON:  Things got

14  better?

15          INMATE TOTTEN:  Yeah.

16          PRESIDING COMMISSIONER BRYSON:  I see.  Same

17  stepfather?

18          INMATE TOTTEN:  Same stepfather.

19          PRESIDING COMMISSIONER BRYSON:  But -- but did

20  he ever abuse you or --

21          INMATE TOTTEN:  No, not really.

22          PRESIDING COMMISSIONER BRYSON:  Did he abuse

23  your mom?

24          INMATE TOTTEN:  Yeah.

25          PRESIDING COMMISSIONER BRYSON:  In what way?

26          INMATE TOTTEN:  He used to beat her up, throw

27  things at her.

10

1          PRESIDING COMMISSIONER BRYSON:  Hmm.  What do

2    you think you took from that experience?  Do you think

3    that effected you?

4          INMATE TOTTEN:  Well, I seen a lot of that.  It

5    probably did.  He -- he -- he did it a lot to my mom

6    and dad or to my mom I mean.

7          PRESIDING COMMISSIONER BRYSON:  Uh huh.  And did

8    she just take it or what happened on that?

9          INMATE TOTTEN:  She -- she would get him back

10   sometimes.

11         PRESIDING COMMISSIONER BRYSON:  Mm hmm.  Hmm.

12   You -- you also said that your mom was the glue that

13   held things together, and while she'd occasionally

14   yell and throw things, she was considered the

15   peacemaker.  Is she still alive today?

16         INMATE TOTTEN:  Yes.

17         PRESIDING COMMISSIONER BRYSON:  Do you have a

18   relationship with her?

19         INMATE TOTTEN:  Yes.  I call her every week.

20   Yeah.

21         PRESIDING COMMISSIONER BRYSON:  Do you?

22         INMATE TOTTEN:  Yeah.  She has cancer now.  She

23   just came down with cancer about three years ago.

24         PRESIDING COMMISSIONER BRYSON:  OK.  Uh huh.

25   All right.  Now, you had three children.  Have you

26   kept in touch with them?

27         INMATE TOTTEN:  No.  I haven't seen them in a

11

1    while.

2            PRESIDING COMMISSIONER BRYSON:  OK.  OK.

3            INMATE TOTTEN:  No one's seen 'em-mom and dad,

4    brothers and sisters.  She won't let anybody see 'em.

5            PRESIDING COMMISSIONER BRYSON:  I see.  OK.  How

6    about -- let's see.  You -- you have a brother or a

7    sister, is that right?

8            INMATE TOTTEN:  Two sisters --

9            PRESIDING COMMISSIONER BRYSON:  Two sisters.

10           INMATE TOTTEN:  -- and one brother.

11           PRESIDING COMMISSIONER BRYSON:  I see.  How are

12    they?

13           INMATE TOTTEN:  Good.

14           PRESIDING COMMISSIONER BRYSON:  All right.  They

15    keep in touch with you?

16           INMATE TOTTEN:  Sure.

17           PRESIDING COMMISSIONER BRYSON:  OK.  Nobody else

18    in prison?

19           INMATE TOTTEN:  Nope.

20           PRESIDING COMMISSIONER BRYSON:  OK.

21           INMATE TOTTEN:  Nobody.  No.  Nobody in our

22    family's been in prison.

23           PRESIDING COMMISSIONER BRYSON:  That's -- OK.

24    Now, were you involved with drugs at some point?

25           INMATE TOTTEN:  Yeah.

26           PRESIDING COMMISSIONER BRYSON:  Methamphetamine?

27           INMATE TOTTEN:  Yes.

12

1        PRESIDING COMMISSIONER BRYSON:  Was that your

2    primary drug of choice?  How did that come about?

3    Were you -- you weren't in a gang or anything like

4    that, were you?

5        INMATE TOTTEN:  No.  Heavens no.  I was just --

6    just with some friends just introduced it to me at a

7    party and -- and --

8        PRESIDING COMMISSIONER BRYSON:  Would you say

9    you were an addict?

10       INMATE TOTTEN:  Mostly social.  I wasn't doing

11   it all the time, but I did -- I did it a few times a

12   month.

13       PRESIDING COMMISSIONER BRYSON:  How do you think

14   it affected you?  Do you think it had an affect or

15   not?

16       INMATE TOTTEN:  Sure.  Any type of drug has an

17   affect on people any time you do it, alcohol or any

18   kind of drugs, yeah.

19       PRESIDING COMMISSIONER BRYSON:  What I'm getting

20   at is do you think it -- and without -- I don't know

21   you don't want to talk about the crime, but do you

22   think it played a role in this?  Were you -- were you

23   high (indiscernible)

24       INMATE TOTTEN:  I was on it, yeah.  I was high,

25   yeah.  If I wasn't high, I probably wouldn't have --

26   it probably would have never happened.

27       PRESIDING COMMISSIONER BRYSON:  So what did it -

13

1   - how did it change your character to be on meth?

2       INMATE TOTTEN:  Well, you stay -- it keeps you

3   up for a long time, and, you know --

4       PRESIDING COMMISSIONER BRYSON:  Did it enhance

5   your aggression level do you think at all?

6       INMATE TOTTEN:  Probably, yeah.  I would say it

7   did, yes.  (indiscernible)

8       PRESIDING COMMISSIONER BRYSON:  Could you see

9   that -- " see that" from inside your own self at the

10  time?  Could you -- could you feel -- did you feel

11  empowered whether you were on meth, or, you know, how

12  did you -- you feel?

13      INMATE TOTTEN:  Sure.  Sure.  That's what it

14  does to you, yeah.  That's what it does to you.

15      PRESIDING COMMISSIONER BRYSON:  I've never done

16  meth so I just don't know so I ask, you know, what --

17      INMATE TOTTEN:  Sure.  I -- I've read up on it -

18  -

19      PRESIDING COMMISSIONER BRYSON:  Uh huh.

20      INMATE TOTTEN:  -- does, you know, it's very

21  harmful to you.

22      PRESIDING COMMISSIONER BRYSON:  Yeah, it

23  certainly is.  So do you think it had any residual

24  effects or were, you know, in --

25      INMATE TOTTEN:  On -- on -- on the crime?

26      PRESIDING COMMISSIONER BRYSON:  No.  On -- on

27  you, the -- the -- the -- the methamphetamine.

14

1   Sometimes it really messes people up.

2       INMATE TOTTEN:  I didn't do it for a long time

3   so, thank God, you know, it wasn't a lifetime thing.

4   It was a short-term.

5       PRESIDING COMMISSIONER BRYSON:  Uh huh.  Have

6   you done any inside here?

7       INMATE TOTTEN:  No.  No.  No.  Nothing.

8       PRESIDING COMMISSIONER BRYSON:  Mm hmm.

9       INMATE TOTTEN:  I've been clean in here for 16

10  years now.

11      PRESIDING COMMISSIONER BRYSON:  Right.  Right.

12  Is there anything else about your -- your upbringing

13  that you want to tell us that will help us understand

14  you better in here?  OK.  Well, maybe if you -- if you

15  think of anything, you're welcome to bring it up.

16      INMATE TOTTEN:  Well, I was in the union for 14

17  years before I came in here, a tile setter in the

18  marble union.

19      PRESIDING COMMISSIONER BRYSON:  I see.

20      INMATE TOTTEN:  So I was still working before I

21  came in here.

22      PRESIDING COMMISSIONER BRYSON:  Oh, yeah?

23      INMATE TOTTEN:  I think a little bit in the 90s

24  before this happened, things were kind of --

25  construction kind of went downhill and stuff so it was

26  kind of -- made it kind of rough there for a while.

27      PRESIDING COMMISSIONER BRYSON:  It's certainly

15

1    back up today.

2         INMATE TOTTEN:  Yeah.  Yeah.

3         PRESIDING COMMISSIONER BRYSON:  That's for sure.

4         INMATE TOTTEN:  If I was out there the last 15

5    years, I would've done pretty good in construction.

6         PRESIDING COMMISSIONER BRYSON:  Yeah.  Do you

7    feel that you'd be pretty current now with --

8         INMATE TOTTEN:  Oh, yeah.  Oh, yeah.

9         PRESIDING COMMISSIONER BRYSON:  Mm hmm.

10        INMATE TOTTEN:  I've gotten really good reports

11   on everything I've done in here.

12        PRESIDING COMMISSIONER BRYSON:  Uh huh.

13        INMATE TOTTEN:  I did some tile work up in

14   Susanville for -- I was up there for about six or

15   seven years doing tile work up there origin that

16   institution.

17        PRESIDING COMMISSIONER BRYSON:  I see.  I'm

18   going to give you an opportunity at this -- at this

19   time, and, again, you can -- you'll get more chances

20   to speak and -- and so forth, but can you give us a

21   general feeling of how do you feel about the crime

22   now?  You know --

23        INMATE TOTTEN:  Well, I -- it should've never

24   happened.  I don't know what I was thinking.  I was

25   just -- I was on meth at the time, and -- and, like I

26   said, if I wasn't on meth, I don't think it would've

27   ever happened 'cuz I don't think I -- I could -- I

16

1    just don't think I could've done something like that

2    if I wasn't on drugs.

3         PRESIDING COMMISSIONER BRYSON:  OK.

4    Commissioner, do you have any questions of this inmate

5    at this point?  All right.  Well, if you'll turn your

6    attention to Commissioner Bentley, we'll go to post-

7    conviction factors.

8         DEPUTY COMMISSIONER BENTLEY:  Your last hearing

9    was June 29th of 2004?

10        INMATE TOTTEN:  Yes.

11        DEPUTY COMMISSIONER BENTLEY:  OK.  You came into

12   the Department of Corrections in January of '92, and

13   you've been here at CTF since March of 2000.

14        INMATE TOTTEN:  Yes.

15        DEPUTY COMMISSIONER BENTLEY:  You've got a

16   classification score of 19 and you've never received

17   any 115s.

18        INMATE TOTTEN:  Right.

19        DEPUTY COMMISSIONER BENTLEY:  And you've got two

20   counseling chronos, and the last one, that was some

21   sort of misuse of the telephone, and that was in '95.

22   You've completed vocational landscaping.

23        INMATE TOTTEN:  Yes, ma'am.

24        DEPUTY COMMISSIONER BENTLEY:  And you've got a

25   lot of -- you've got a lot of trade chronos about

26   that.  They said they retained you on a job to finish

27   a project that you'd begun working on, and they just

17

1    indicate what a good worker -- an excellent worker you

2    -- you were, and you -- your work assignments into

3    last year, you're a machine operator.

4           INMATE TOTTEN:  Yes.

5           DEPUTY COMMISSIONER BENTLEY:  Exactly what do

6    you do?

7           INMATE TOTTEN:  I straighten lumber when it

8    comes into the shop for furniture.

9           DEPUTY COMMISSIONER BENTLEY:  Oh, OK.

10          INMATE TOTTEN:  It comes in all crooked, and I

11   straighten it all out, and then send it on to the next

12   shop for --

13          DEPUTY COMMISSIONER BENTLEY:  OK.

14          INMATE TOTTEN:  -- they build furniture with it.

15          DEPUTY COMMISSIONER BENTLEY:  OK.  And you've

16   been getting exceptional to above average work

17   reports, and you've been in that for -- well, all this

18   past period of time.

19          INMATE TOTTEN:  Yes.

20          DEPUTY COMMISSIONER BENTLEY:  For quite a while.

21   And you started out educationally -- I noticed in --

22   in '01 you took a test, and your reading level was at

23   4.1.

24          INMATE TOTTEN:  Yeah.  I didn't have any glasses

25   at the time.

26          DEPUTY COMMISSIONER BENTLEY:  Oh, OK.  Well,

27   that makes sense.

18

1        INMATE TOTTEN:  I had a chrono in there about

2   that.

3        DEPUTY COMMISSIONER BENTLEY:  Oh, OK.  I didn't

4   see that one.  In '02 you had a grade point level of

5   7.2, but in '93 you got your high school equivalency.

6        INMATE TOTTEN:  '93, yes.

7        DEPUTY COMMISSIONER BENTLEY:  Yeah.  OK. I saw

8   that in the file.  And then you've been taking some

9   courses on AIDS prevention, and hepatitis prevention.

10        INMATE TOTTEN:  Right.

11        DEPUTY COMMISSIONER BENTLEY:  And you got

12   involved in self-help in '97.

13        INMATE TOTTEN:  Right.

14        DEPUTY COMMISSIONER BENTLEY:  Sounds like when

15   you initially came in, I was reviewing your reception

16   record where they go over and they ask you all these

17   questions, that you really claimed you didn't have any

18   kind of problems with any drugs or alcohol.

19        INMATE TOTTEN:  Right.

20        DEPUTY COMMISSIONER BENTLEY:  But when you

21   reflect back on it now, it seems to me -- 'cuz meth is

22   such an addictive -- the most --

23        INMATE TOTTEN:  Right.

24        DEPUTY COMMISSIONER BENTLEY:  -- addictive drug

25   that you were heading right down that line.

26        INMATE TOTTEN:  Right.

27        DEPUTY COMMISSIONER BENTLEY:  Yeah.  OK.  And so

19

1   you've been consistently involved in that since '97,

2   and what have you learned?

3        INMATE TOTTEN:  I've learned to take

4   responsibility for your actions.

5        DEPUTY COMMISSIONER BENTLEY:  Mm hmm.

6        INMATE TOTTEN:  I'm -- I'm willing to make a

7   list of all the people I've harmed and make amends to

8   'em.

9        DEPUTY COMMISSIONER BENTLEY:  Have you done

10  that?

11       INMATE TOTTEN:  Sure.

12       DEPUTY COMMISSIONER BENTLEY:  OK.  You said

13  you're willing to do that, but --

14       INMATE TOTTEN:  Sure.

15       DEPUTY COMMISSIONER BENTLEY:  OK.  Who -- who --

16  who have you harmed?

17       INMATE TOTTEN:  Well, I harmed my wife, and my

18  children, and my family, and -- and every day I call

19  'em, I try to make amends to 'em, you know?  I've

20  wrote a couple letters in there, too to the -- to

21  Janet and the kids.  I don't -- I don't know if you

22  seen those in there.

23       DEPUTY COMMISSIONER BENTLEY:  And -- and they

24  haven't been sent though, very that?

25       INMATE TOTTEN:  No.

26       DEPUTY COMMISSIONER BENTLEY:  All right.  What

27  do you do in your spare time?

20

1        INMATE TOTTEN:   Exercise.

2        DEPUTY COMMISSIONER BENTLEY:   Mm hmm.

3        INMATE TOTTEN:   I make peanut butter cups for

4    the people in the -- in the dorm where I live, and I

5    talk to younger -- younger people in the building

6    about the effects of drugs and what it did to me, some

7    of 'em -- some of 'em that will listen, but --

8        DEPUTY COMMISSIONER BENTLEY:   Yeah, right.

9        INMATE TOTTEN:   -- there's a few of them that

10   don't -- a lot of 'em that don't.

11       DEPUTY COMMISSIONER BENTLEY:   Yeah.

12       INMATE TOTTEN:   I explain to 'em about me not

13   having seen my kids all this time 'cuz of the effects

14   of drugs, basically.

15       DEPUTY COMMISSIONER BENTLEY:   Yeah.  So you've

16   lost track of your -- of your children?

17       INMATE TOTTEN:   Yeah.  I -- I don't have any

18   contact with 'em at all.

19       DEPUTY COMMISSIONER BENTLEY:   All right.  But

20   you get visits.  Do your parents come?

21       INMATE TOTTEN:   My mom has cancer so she hasn't

22   -- I haven't seen her in a couple years.

23       DEPUTY COMMISSIONER BENTLEY:   Oh, OK.

24       INMATE TOTTEN:   She's been going through

25   chemotherapy, and just kind of busy.  It's been kind

26   of hectic.  Last time she came to see me, she was

27   sitting out there for like five hours before she could

21

1    come in here and see me.

2         DEPUTY COMMISSIONER BENTLEY:  Oh.  What else

3    would you like to tell me about what you've been doing

4    in prison?

5         INMATE TOTTEN:  Well, I keep busy.  I work.  I

6    work a lot of overtime.

7         DEPUTY COMMISSIONER BENTLEY:  OK.

8         INMATE TOTTEN:  So I try to -- try to keep busy

9    at work.  I try to average anywhere -- I average

10   anywhere from 40 to 50 hours a week at work so that

11   takes a lot of time my.

12        DEPUTY COMMISSIONER BENTLEY:  Do you enjoy this

13   work that you're doing?

14        INMATE TOTTEN:  Oh, yeah.  I love it.

15        DEPUTY COMMISSIONER BENTLEY:  OK.

16        INMATE TOTTEN:  It's really good.

17        DEPUTY COMMISSIONER BENTLEY:  What's your pay

18   number?

19        INMATE TOTTEN:  I'm -- I'm an A number, highest

20   you can be paid.

21        DEPUTY COMMISSIONER BENTLEY:  All right.  Your

22   psychological report was done for this hearing -- was

23   done for prior hearings, but it's still appropriate to

24   use in this hearing by R. Talbot, and it's dated 11/19

25   of 2003.  It goes through your history, and -- which

26   Commissioner Bryson has covered, and where you are

27   marital history and climate.  It talks about your

22

1    substance abuse history.  It says that you told the

2    doctor you've used marijuana briefly about the age of

3    15.  You didn't use any other drugs for about 10 years

4    after that until you started using methamphetamine.

5    It said you began using methamphetamine over the

6    weekends for about three years until you committed

7    your life crime.  Was it just on the weekends?

8         INMATE TOTTEN:  Sometimes when I would hang out

9    on the weekends.  Sometimes it was just, you know, it

10   was just friends getting together, you know, water

11   skiing, or at the, you know, beach, or --

12        DEPUTY COMMISSIONER BENTLEY:  So all the friends

13   would use it, too?

14        INMATE TOTTEN:  Oh, yeah.

15        DEPUTY COMMISSIONER BENTLEY:  Yeah.  That is

16   such terrible stuff.

17        INMATE TOTTEN:  It's terrible stuff.

18        DEPUTY COMMISSIONER BENTLEY:  Yeah.

19        INMATE TOTTEN:  Terrible.

20        DEPUTY COMMISSIONER BENTLEY:  I can't fathom why

21   just to have fun that you'd want to use that stuff,

22   and you've seen -- they probably haven't seen it, but

23   you've seen what it does to people's teeth.

24        INMATE TOTTEN:  I've seen what it does to

25   people's teeth.  I got good teeth, thank God.

26        DEPUTY COMMISSIONER BENTLEY:  Yeah.

27        INMATE TOTTEN:  I didn't do it for very long.

23

1      DEPUTY COMMISSIONER BENTLEY:  And what it does

2  to some of them mentally.

3      INMATE TOTTEN:  Mentally.

4      DEPUTY COMMISSIONER BENTLEY:  You know, you --

5  you were having some mental health issues over it,

6  right?

7      INMATE TOTTEN:  Over it, right.

8      DEPUTY COMMISSIONER BENTLEY:  Suicidal and stuff

9  like that?

10      INMATE TOTTEN:  It was depression, yeah.

11      DEPUTY COMMISSIONER BENTLEY:  Yeah.  And,

12  fortunately with you, you didn't do it long enough for

13  that to last.  It's get to the point even when you're

14  off it for years, you still have that mental -- and

15  some severe mental damage.  OK.  Under psychiatric and

16  medical history, it says besides your methamphetamine

17  dependence, it indicated that as consequences of your

18  drug use, you -- you -- you developed suicidal

19  tendencies, and it says you no longer feel that way.

20  It's talking about your parole plans, which the

21  Commissioner's going to cover very shortly, and then

22  under current diagnostic impressions, we have

23  methamphetamine dependence in remission in a

24  controlled environment, and it ruled out ADHD, which

25  other doctors have -- have included in there, and then

26  it goes into the life crime, and since you didn't want

27  to discuss it today, I just kind of wanted to read

24

1    this into the record.  You stated at the time of the
2    crime, you had a methamphetamine problem for a few
3    years.  Though you'd been married for seven years, you
4    were also having an affair with another woman, and his
5    wife found out and sued for divorce taking the
6    children with her.  It says he was under considerable
7    stress, and after having a series of anger-filled --
8    filled meetings with her, he arranged to meet her
9    again, this time at a hospital where he was having a
10   checkup.  He said he hoped to show her how distraught
11   he was so that she would have some sympathy for him.
12   Leading her, he escorted her to her car where he took
13   out a rifle he'd placed in a box and a struggle soon
14   ensued.  During the struggle, he was shot in the leg
15   and then he followed her out of the car as she attempt
16   today run away, and he shot her.  She recovered, and
17   you went to prison.  In discussing the crime, you went
18   on to say you that I had not intended to kill my wife.
19   If I had wanted to kill her, I would have.  I was high
20   on drugs, and further discussion of the crime, he said
21   he had done a bad thing.  Inmate -- the inmate then
22   went on to discuss some of the losses he's experienced
23   since he's been in prison.  He said he's lost a
24   grandmother who has died since he's been in prison.
25   Inmate Totten said he also missed his children.  He
26   mentioned his daughter, at this point, saying he'd
27   like to talk to her.  He also said he exercised bad

25

1    judgment and was sitting in prison because of it.    He
2    finished by saying that he was remorseful for his
3    actions.    He had some of the right answers for my
4    questions and seemed to be on the road to getting his
5    thinking straight.    However, I had to work on getting
6    him to talk about his thinking about how his crime has
7    affected others.    He seemed to be more able to talk
8    about its effect upon him than upon others as if he
9    was not quite thought through the consequences upon
10   others.    I also believe that he needs to work more on
11   the effect of his crime on his former wife and
12   children.    In short, he seemed, to this interviewer,
13   to live in a still too self-centered world.    And then
14   he goes on on Assessment of Dangerousness, he talks
15   about your good disciplinary history, and it says that
16   this time, however, it seems less clear he will be a
17   low risk to the free community.    In particular, he's
18   still seemingly self-centered view of his actions
19   suggestion that his interpersonal maturity is [SPWHA]
20   limited.    If he really, truly suffers from ADHA as he
21   has stated, he may be somewhat impulsive and will need
22   help dealing with his disorder as well.    It must be
23   said that comparing those statements with those made
24   to his earlier interview, he seems to have advanced
25   somewhat in the understanding and appreciation of
26   others as people, but there still is room for growth
27   and needed growth will occur.    Finally, he must

26

1  continue to attend AA and NA classes if he is released
2  as it's an important source of understanding and
3  support.  In conjunction with the foregoing, he also
4  needs to be monitored regularly to see if he's
5  maintaining his abstinence.  Under Clinical
6  Observation, it says your on the road to becoming a --
7  a pentanant human being.  He has further to go,
8  however, before it is reasonable that he is released.
9  So, with that, I'll return to the Chair.
10       PRESIDING COMMISSIONER BRYSON:  All right.
11  Thank you.  As to your parole plans, Mr. Totten, were
12  you still planning to live with your parents in San
13  Juan Capistrano?
14       INMATE TOTTEN:  Yes.
15       PRESIDING COMMISSIONER BRYSON:  OK.  Now, did
16  you have any letters today that -- that confirm that?
17       ATTORNEY HALL:  Only what's in the file,
18  Commissioner, there.
19       PRESIDING COMMISSIONER BRYSON:  OK.  Let me
20  check.  All right.  We do have a letter from your
21  parents, which is dated April 23rd, 2006, and this is
22  written by Jason and Gana, G-A-N-A, Totten, T-O-T-T-E-
23  N, on behalf of their son.  The time has come to let
24  him be a productive person on the outside.  We, the
25  family, and myself will assist him in the transition.
26  We have a vehicle for him and a place to live.  We'll
27  give him love and support.  We feel Tony has paid for

27

1    his actions, and that he has changed, and will not let

2    us down. All right. And then we have also a letter

3    from Silvia, S-I-L-V-I-A, Construction, and this is

4    dated May 3rd of 2006, from Perry, P-E-R-R-Y, J.

5    Totten, Superintendent, your brother, and he says I've

6    worked for Silvia Construction for the past 15 years.

7    There are many opportunities in the construction

8    field. I can put Anthony to work for me in

9    construction upon his release. There are many areas

10   where Anthony could use his skills and be successful.

11   So it does appear that you have parole plans. Now,

12   this is located in Rancho Cucamonga. Would that be

13   within commute distance?

14        INMATE TOTTEN: Yes.

15        PRESIDING COMMISSIONER BRYSON: OK.

16        INMATE TOTTEN: He works all over Orange County

17   and L.A. County.

18        PRESIDING COMMISSIONER BRYSON: I see. OK. So

19   you have a good relationship with your brother?

20        INMATE TOTTEN: Sure. Sure.

21        PRESIDING COMMISSIONER BRYSON: OK. All right.

22   Is there anything I've missed, counsel?

23        ATTORNEY HALL: I think that's everything.

24        PRESIDING COMMISSIONER BRYSON: I've sent out

25   3042 notices. Those notices go to agencies having a

26   direct interest in your case. We have a July 3rd,

27   2006, response from the City of Huntington Beach

28

1    Police Department, and this is written by Sergeant D.

2    Dierking, that's D-I-E-R-K-I-N-G, Crimes Against

3    Persons Unit, and on behalf of Kenneth W. Small,

4    common spelling, Chief Police. On October 30th, 1990,

5    at approximately 10:30 a.m., the victim Janet Totten,

6    who was five months pregnant, exited the Kaiser

7    medical office in Huntington Beach. She was contacted

8    by her husband, Anthony Totten, who was carrying a

9    white box. He told her the box contained a present

10    for their soon-to-be five-year old daughter. Anthony

11    convinced, who had recently obtained a restraining

12    order against him to drive him to his nearby car.

13    Once inside her car, they argued. An [THOPB]--opened

14    the box, took out a loaded .22 caliber rifle he had

15    concealed in it. Janet realized that Anthony was

16    going to kill her so she grabbed the gun attempting to

17    wrestle it from him. She honked her car horn and

18    yelled. She opened her car door and took off running.

19    She saw her husband, Anthony chasing her with the gun.

20    She yelled and screamed for help as he pursued her.

21    He caught up with her shooting her in the back of the

22    head. She fell to the ground. Anthony fled the

23    scene. He turned himself in at the Orange Police

24    Department the next day with his attorney. The

25    investigation revealed that Anthony had purchased the

26    gun several days before he had attempted to kill his

27    wife. Anthony shot himself in the leg in an effort to

29

1  argue the incident was actually self-defense.  Anthony

2  Totten is a dangerous man as he demonstrated when he

3  chased down his pregnant wife shooting her in the head

4  in an effort to kill her the Huntington Beach Police

5  Department opposes any type of parole or leniency for

6  Anthony Totten. We also have a representative of the

7  Orange County District Attorney's Office present who

8  will have the opportunity to make a statement

9  regarding parole suitability prior to the conclusion

10  of this hearing.  Commissioner Bentley, do you have

11  any questions of this inmate?

12      DEPUTY COMMISSIONER BENTLEY:  Yeah.  I just have

13  one because my other questions were related to the

14  crime.  But I just noticed on his intake evaluation

15  that you put down your religion as b, and then small

16  a, capital B and then and b.

17      INMATE TOTTEN:  What? Hmm.

18      DEPUTY COMMISSIONER BENTLEY:  I -- I just

19  wondered what it was, but you don't -- you don't have

20  a clue either.  I don't know.  Maybe they just typed

21  in some letters.  OK.  That's all I had.

22      PRESIDING COMMISSIONER BRYSON:  All right.  OK.

23  Does the district attorney have questions of this

24  inmate?

25      DEPUTY DISTRICT ATTORNEY CHRISOPOULOS:  Yes.  I

26  would like the commissioner to ask the inmate prior to

27  committing this commitment offense, how many times had

1    he physically abused his wife.

2        INMATE TOTTEN:  I don't know.  I can't answer

3    that.

4        DEPUTY DISTRICT ATTORNEY CHRISOPOULOS:  What?

5        PRESIDING COMMISSIONER BRYSON:  He can't answer

6    that.  He doesn't know.

7        DEPUTY DISTRICT ATTORNEY CHRISOPOULOS:  OK.  A

8    follow-up to that question, does he recall a time on

9    May 12th, 1990, when the victim tried calling the

10   police and the inmate told her not to touch the

11   telephone, and then he punched her in the mouth

12   knocking her to the ground and breaking her front

13   teeth?  Does he recall that incident?

14       INMATE TOTTEN:  No.

15       DEPUTY DISTRICT ATTORNEY CHRISOPOULOS:  I have

16   no other questions.

17       PRESIDING COMMISSIONER BRYSON:  All right.

18   Counsel, do you have any questions of this inmate?

19       ATTORNEY HALL:  Yes.  Thank you.  Mr. Totten,

20   how do you feel about the harm you caused your wife

21   and children?

22       INMATE TOTTEN:  I feel bad.  Nobody should ever

23   go through something like that.

24       ATTORNEY HALL:  Is this something you believe

25   you could ever do again to any other individual?

26       INMATE TOTTEN:  No, never.

27       ATTORNEY HALL:  And do you have long-term plans

31

1    to continue with substance abuse prevention?

2         INMATE TOTTEN:  Sure.  I had a -- a sponsor, an

3    NA and AA sponsor from the street.  I had 'em put a

4    letter in there from my last hearing.  I wasn't able

5    to contact him.

6         ATTORNEY HALL:  Now Doctor Talbo -- Talbot in

7    his 2003 evaluation indicated that he felt you needed

8    additional time to demonstrate that or to,

9    essentially, confirm in his mind that you pose a low

10   risk of harm to the community.  How do you feel about

11   that report and the gains that you have made over the

12   years, and, in particular, since November 2003?

13        INMATE TOTTEN:  Well, I've done 33 more months

14   since that report was written so -- and I did go back

15   in and talk to Doctor Talbot about that report about

16   six times prior to him writing that, and that man

17   wouldn't -- wouldn't even look at me in the eyes.  He

18   would look out the window and wouldn't even talk to me

19   about that report he wrote so I don't know -- he went

20   to his boss and was trying to get some things fixed on

21   this, but his boss said it was too late and there was

22   nothing he could do about it.  So I don't know what

23   that was all about.

24        ATTORNEY HALL:  Tell -- tell me what you believe

25   you have done over the last 33 months that would

26   demonstrate that even if he -- let's -- just for the

27   sake of argument, his assessment was correct, how do

32

1   you think that in the 33 months that what you have

2   done will improve that assessment?

3           INMATE TOTTEN:  Well, I've remained disciplinary

4   free my entire incarceration.  I've done every program

5   that the -- everybody's asked me to do in the last 15

6   years that I've been in here.

7           ATTORNEY HALL:  And how has that affected you in

8   terms of your outlook, in terms of --

9           INMATE TOTTEN:  It makes me feel good that I've

10  accomplished something while I'm in here, and by

11  showing everybody that -- that I can be a productive

12  citizen in society.  Some of the things you go through

13  in here, it's -- it's -- it's tough in here sometimes,

14  you know, so that proves right there that you can -- I

15  think you can survive out in the street.

16          ATTORNEY HALL:  Thank you.  No further

17  questions.

18          PRESIDING COMMISSIONER BRYSON:  All right.

19  Thank you.  And I'd like to invite the district

20  attorney to make a closing statement.

21          DEPUTY DISTRICT ATTORNEY CHRISOPOULOS:  Thank

22  you.  In looking at this offense, it is so cruel and

23  callous that one can imagine trying to gun after one's

24  wife, especially in light of the fact that she is the

25  mother of two of his children at the time, she was

26  pregnant -- five-months pregnant at the time of this

27  attempted murder, and, yet, this inmate had a

33

1   systematic plan to go after her.  In looking at the

2   facts of the case, as stated in the probation report,

3   these first threats towards her life came

4   approximately one week before on October 23rd of 1990,

5   when he showed up at the victim's mother's house

6   threatening to kill her, followed by the next day,

7   October 24th, another threat was made to the victim,

8   which led to the victim getting a restraining order

9   against the inmate.  We have the fact that this

10  particular weapon was purchased three or four days

11  before this particular crime.  It was a bolt-action

12  rifle.  The facts as listened -- listed in the

13  probation report, as far as his statements -- I know

14  the inmate didn't speak about the crime today, but in

15  looking at his statement to the probation officer back

16  when he was convicted of this charge, he stated that

17  the gun just went off.  He chased after her and it

18  just went off.  In looking at the inmate's statement

19  to the psychologist in the 2003 report, he continues

20  to state he did not intend to kill her, and he tell us

21  today that when he tried confronting the psychologist,

22  the psychologist would not even look at the inmate.

23  What is clear is that the jury did find him guilty of

24  intending to kill his wife.  In looking at the facts

25  of crime, and I think it's important -- I know the

26  commissioner read part of the appellate opinion, but

27  in looking further on in the appellate opinion, I'm

34

1   going to read a couple paragraphs, I think it's

2   important for the record to show that this was a

3   planned execution of his wife.  The appellate report

4   reads, beginning on page 5,"This is not a close case.

5   Totten was angry with his wife over the issues of

6   visitation.  One week prior to the shooting, he had

7   threatened to kill her and told her, Janet, you are

8   dead.  On the day of the restraining order and limited

9   visitation order were obtained, he confirmed with

10  Janet the date of her next obstetrics appointment.

11  Three days prior to the shooting, he purchased a

12  rifle.  At some point, he spray painted the box that

13  would contain it presumably in order to get close to

14  Janet with it.  He loaded the rifle with seven bullets

15  in the magazine.  On the day of the shooting, he

16  parked his truck equipped with a police scanner behind

17  the medical center so that Janet would not see it and

18  used a ruse to place the box inside the car and to

19  insinuate himself into the front seat.  After Janet

20  escaped from the car, he ran after her, cult her off

21  and when she evaded him again, he stopped, cocked the

22  rifle, aimed and shot her.  Finally, he walked up to

23  her and nudged her body with his foot making sure she

24  was hit."  It is clear by all facts that this was a

25  planned execution of his wife, and the fact that in

26  2003 he continues to maintain that he did not intend

27  on harming her, flies in the face of all the evidence,

1   which the jury considered. The People feel that in

2   order for him to show some sort of insight into the

3   crime, he needs to come forward and be to be more

4   forthright into his responsibility into his crime.

5   This is further acknowledged in the psyche report of

6   2003 where the psychologist talks about how this

7   individual continues to be self-centered.  He has

8   limited interpersonal maturity.  He has further to go.

9   This is from the most recent psyche report.  And,

10  finally, I would like to end with the victim's

11  statement as she presented to the probation department

12  in the probation officer's report on page 11. "I think

13  Tony should go to prison for as long as possible.  He

14  doesn't care what he does or who he hurts.  He thinks

15  he should be allowed to do anything he wants and gets

16  away with it.  I remain fearful of him.  He'll do it

17  again.  If he gets a slap on the hand, it's like

18  giving him permission to go out, and buy a gun and do

19  it again.  He has no remorse for what he has done.

20  It's like a big joke.  My brother, Tim, saw him

21  laughing and joking with his mother and girlfriend

22  right after he was found guilty.  He has been found

23  guilty of something and he should serve a sentence.

24  I've been in hiding for over a year because he's been

25  out of custody." And in looking at the victim's

26  injury, she is living now with a permanent hearing

27  loss to her left ear.  She has permanent restriction

36

1   of her jaw movement.  She has permanent loss of

2   feeling to her upper left teeth.  All of these actions

3   were because of this inmate, and this inmate has much

4   more to go to reflect upon the crime, to reflect upon

5   his maturity, and for all these reasons, the People

6   are asking for a two-year denial of parole.  Thank

7   you.

8        PRESIDING COMMISSIONER BRYSON:  Thank you,

9   counselor.  All right.  Counselor, would you like now

10  to make the closing statement?

11       ATTORNEY HALL:  Yes, Commissioner, but if I

12  could have just a moment to speak to ask my client a

13  question.  The facts as read into the record by the

14  deputy district attorney, leaves out one important

15  thing, which is not contained in the appellate

16  transcript and that is the fact that even after Mr.

17  Totten was convicted of this crime, he remained on

18  bail until the his sentence.  Again, Mr. Totten never

19  denies the crime.  He does not deny the crime.  I

20  don't think that this forum is the proper place to try

21  or attempt to determine his guilt -- guilt or

22  innocence.  This panel clearly has to accept the fact

23  of conviction, and in choosing in not to discuss the

24  crime, Mr. Totten is merely exercising his right not

25  to do so.  I think it would not be productive for Mr.

26  Totten to sit here and try to respond to the -- all

27  the nuances of -- of this crime.  It's suffices that

37

1  he takes responsibility for it, and I think that's all

2  that should be required of him.  He should not have to

3  dispute every contention made by the victim in this

4  case, and it would not serve any productive purpose to

5  do that.  Importantly, he was convicted.  There's no

6  denying that it was a horrific crime.  There's no

7  denying that his ex-wife suffered physically, and

8  emotionally and continues to suffer, but that's not

9  the criteria for this panel to decide whether Mr.

10  Totten has -- has -- has advanced to the point that he

11  can be found suitable for parole or not.  Certainly,

12  it is a factor, but it's not the only factor.  There's

13  many more factors, which Mr. Totten and his record has

14  demonstrated would certainly establish that he should

15  be found suitable for parole.  Firstly, the

16  determination is whether he would pose an unreasonable

17  risk of harm to the community should he be paroled,

18  and the record, when properly examined clearly

19  demonstrates that he would not pose a risk.

20  Certainly, at the time of this crime, Mr. Totten was

21  under going significant stress in his life.  There was

22  the stress -- emotional stress as a result of the

23  family discord between himself, and his wife and his

24  children, and given the significant loss of the

25  children of their father, and given the pain and the

26  hardship that Mrs. -- the former Mrs. Totten

27  experienced, certainly, this is not something my

38

1    client would ever want to visit upon her again or

2    anyone in the community.  Clearly, he has learned from

3    that gross misjudgment on his part.  Clearly, he's

4    learned that the use of drugs really significantly

5    impaired his judgment and, certainly, heightened the

6    stress that he was undergoing with his family discord,

7    and, certainly, that's not something that would an

8    again.  With respect to Doctor Talbot's evaluation,

9    and back in November of 2003, when Doctor Totten [sic]

10   indicated that he felt that Mr. Totten needed some

11   more time, we believe that 33 months have passed,

12   which -- in which my client, clearly, has continued to

13   demonstrate the adherence of the rules of the

14   institution.  He has continued to work productively.

15   He has continued to participate in self-help.  He's

16   continued to show respect to institutional staff and

17   his peers, and he has continued to remain discipline

18   free.  So we believe that this psychological

19   evaluation, certainly, while we contend that it -- the

20   conclusion of Doctor Talbot then that Mr. Totten

21   needed more time, while we don't agree with it, we --

22   we contend that even if Doctor Totten -- Doctor Talbot

23   was -- was correct in his assessment that Mr. Totten

24   needed more time to continue to demonstrate that he

25   would be safe if released into the community, that he

26   has, clearly, demonstrated that.  We know that Mr.

27   Totten has a job offer from his brother in a field --

39

1   the construction field, which Mr. Totten has worked

2   from when he left school at an early age to get into

3   the construction trade, specifically, as a tile setter

4   and -- and, otherwise, working in construction.  He

5   has the support of his brother, who would provide him

6   that employment, and would be there as a mentor as

7   well as someone in the community who can guide -- help

8   to guide Mr. Totten.  In addition, Mr. Totten's

9   parents are there providing a home for him, and also

10  additional guidance and support, and other family

11  members and other community support.  So, clearly, Mr.

12  Totten would have every reason to adhere to the laws.

13  Clearly, he's someone who has not had any history of

14  any violation of law prior to the commitment offense,

15  nor since the commitment offense, and --

16      SIDE 2

17      DEPUTY COMMISSIONER BENTLEY:  OK.  This is the

18  second side of the tape in the subsequent parole

19  consideration hearing for Inmate Totten, Anthony, CDC

20  number H-21049.

21      ATTORNEY HALL:  Clearly, Mr. Totten has shown

22  remorse and expressed, again, today his deep and

23  sincere remorse for having committed this crime, that

24  he is looking forward to being out in the community

25  where he can continue to abide by the rules of

26  society.  Again, having grown up in a stable family

27  life, having left school early to work in the tile

40

1  trade with his father, and working in the union, he,

2  certainly, can return to work in this field and,

3  again, join the union and continue to work

4  productively.  We believe that given all the

5  accomplishments of Mr. Totten in, clearly,

6  demonstrating that he has matured over the years, and

7  at his present age of 48 years old where most

8  psychologists opined that at this age, the risk of

9  recidivism, certainly, has decreased substantially, we

10  believe that Mr. Totten continues to demonstrate that

11  he can continue to obey the rules, and for those

12  reasons, we would ask that parole be granted at this

13  time.

14      PRESIDING COMMISSIONER BRYSON:  All right.

15  Thank you, counselor.  All right.  Sir, I'd like to

16  give you the opportunity to make a statement to this

17  panel regarding your suitability for parole.

18      INMATE TOTTEN:  Well, I think I've demonstrated

19  over the past 15 years that I can follow the law, and

20  I, like I said, I was out on bail during the -- before

21  and after my conviction, and I did turn myself in so

22  that showed responsibility and remorse by turning

23  myself in, and I've -- I'm -- I'm really sorry that

24  this happened, and I apologize to the district

25  attorney in Orange County, and my family, and Janet

26  and the kids for what I've put 'em through.

27      PRESIDING COMMISSIONER BRYSON:  OK.  Thank you

41

1   for your remarks.   We'll now recess for deliberation.

2   The time is 12:10.

3                        R E C E S S

4                         --o0o--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27